NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AMERICAN POSTAL WORKERS UN-
ION, ST. LOUIS, MISSOURI LOCAL
AFL–CIO and United States Postal Ser-
vice, Respondent.

No. 79–1349.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 3, 1979.

Decided March 31, 1980.

Lafe Solomon, Atty., N. L. R. B., Washington, D. C., for petitioner; John H. Ferguson, Atty., John S. Irving, Gen. Counsel, John E. Higgin, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief.

. D. Richard Froelke, Regional Labor Counsel, U. S. Postal Service, Chicago, Ill., for respondents.

Stephen E. Alpern, Associate Gen. Counsel, Jesse L. Butler, Asst. Gen. Counsel, U. S. Postal Service, Washington, D. C., and D. Richard Froelke, Chicago, Ill., on brief for respondent, U. S. Postal Service.

. Mose Lewis III, Cafferky, Powers, Jordan & Lewis, Washington, D. C., on brief for respondent, American Postal Workers, etc.

Before LAY, Chief Judge,* McMILLIAN, Circuit Judge, and HARPER,** Senior District Judge.

McMILLIAN, Circuit Judge.

This case is before us on the application of the National Labor Relations Board (the Board) for enforcement of its order [1] issued against the American Postal Workers Union, St. Louis, Missouri Local, AFL–CIO (the Union) and the United States Postal Service (the Postal Service) on March 5, 1979. Both the Postal Service and the Union have petitioned for review and set aside of the order. This court has jurisdiction pursuant to § 10(e) of the National Labor Relations Act (the Act), 29 U.S.C. § 160, and § 1208(a) of the Postal Reorganization Act of 1970, 39 U.S.C. § 1208(a). We uphold the Board's finding that the Union violated § 8(b)(1)(A) of the Act by arbitrarily revoking its assent to employee Mary Berry's request for a temporary shift change and violated § 8(b)(2) of the Act by causing the Postal Service to terminate Berry's temporary assignment. We set aside the Board's finding that the Postal Service violated § 8(a)(3) and (1) of the Act by acquiescing in the Union's actions.

This case is set against the background of the Postal Service's struggle with overtime

---

* The Honorable Donald P. Lay became Chief Judge of the Eighth Circuit on January 1, 1980.

** The Honorable Roy W. Harper, United States Senior District Judge for the Eastern District of Missouri, sitting by designation.

1. 240 N.L.R.B. No. 178.

costs. At least since 1971, the Union has represented all the employees at the Postal Service's St. Louis facility in the craft units: Clerk, Special Delivery, Maintenance and Motor Vehicle. The overtime provision, Article VIII, Section 4(B),[2] in the parties' collective bargaining agreement provided that employees were entitled to overtime when they worked outside their regular schedule *at the Postal Service's request.* The Postal Service had attempted to secure "volunteers" who were willing to work outside of their shifts at straight time rates, but the Union contended that such work did not fall within the "employee convenience" exception to the overtime provision. On July 27, 1975, arbitrator Howard G. Gamser issued an award (the Gamser Award) interpreting the overtime provision. The arbitrator concluded that the "volunteers" were actually being permitted to work out of schedule because the Postal Service needed to cover vacancies, rather than for their own convenience. Because the Postal Service's use of such "volunteers" created a danger of circumventing the overtime provision and making individual agreements with employees that were in conflict with the collective bargaining agreement, the Gamser Award specified that, in order to be relieved of the obligation to pay overtime to employees working outside their regular schedules for their own personal convenience, the Postal Service had to secure the Union's approval of such "employee convenience" assignments. Pursuant to the Gamser Award, the Union and the Postal Service devised a form entitled "Request for Temporary Schedule Change for Personal Convenience"[3] to be filled out and signed by employees requesting temporary shift changes. If approved and signed by the Union, the request could be granted by the Postal Service without liability for overtime. The requesting employee's signature and the signature of the steward assigned to the employee's work location[4] were accepted as satisfying that requirement.

In 1977, as a part of the Union's efforts to police the seniority and job-bidding rights of its members, the Postal Service agreed to find job assignments for about 160 unassigned regular employees. At the completion of all the bidding, unassigned regulars were "drafted" to the unfilled positions.

In the meantime, the Postal Service continued to have high overtime costs.[5] Local management was repeatedly admonished to set limits on overtime. Also, Manager of Distribution Malcolm Dearing's own merit pay increases were made contingent on his cutting costs.

The conflict here emanated from Berry's efforts to defer changing her work hours from Tour II to Tour I. Since December, 1975, Berry had been employed by the Postal Service as an unassigned clerk on Tour II (7 a. m. to 3:30 p. m.). By letter dated November 16, 1977, the Postal Service notified Berry that she had been "drafted" to definite assignment on Tour I (10:30 p. m. to 7 a. m.), effective November 26. Because she was solely responsible for the care

2. Overtime shall be paid to employees for work performed only after eight (8) hours on duty in any one service day or forty (40) hours in any one service week. Nothing in this section shall be construed by the parties or any reviewing authority to deny the payment of overtime to employees for the time worked outside of their regularly scheduled work week at the request of the Employer.

3. The form states, " . . . should this request be granted, I will not be entitled to the payment of overtime. . . ." The filing of this form constitutes a waiver of overtime compensation, and the form's main purpose is to protect the Postal Service from claims for overtime compensation.

4. The Union operates under the general direction of its President. Each craft, in turn, has its own president. Subordinate to the craft presidents are stewards. The Clerk Craft has approximately twenty stewards who service employees in that craft within designated work areas in the St. Louis facility.

5. Nationwide, there was a $33 million postal deficit for the quarter ending December, 1977. For the same time frame, the St. Louis Postal Service paid 20,000 hours of overtime and had a deficit of $800,000.00.

of her blind mother, Berry requested[6] deferral of her new assignment until she could arrange for a companion for her mother during the night. She was told to put her request in writing, which she did by a letter dated November 18. On November 23, she was advised by Andrew Johnson, the Operations Analyst in charge of Tour II, to fill out a "Request for Temporary Schedule Change for Personal Convenience,"[7] which she did immediately. She took the form and an attached copy of her November 18 letter to the office clerk who handled grievances and union papers and gave the papers to the clerk to present to the Union for signature. The form was signed and dated on November 23 by Michael Amann, General President of the Union. On November 30, the Postal Service notified Berry that her reassignment had been approved and she would not have to report to Tour I until February 5.

Sometime thereafter, her reassignment came to the attention of William D. Mooney, President of the Clerk Craft division of the Union, who had been active in enforcing the Gamser Award. On December 23, 1977, without any attempt to contact Berry, Mooney wrote the following letter to Manager Dearing:

> This is to inform you that the detail of full-time Regular Clerk Mary Berry will be terminated on 1/1/77 [sic]. She had requested a 60 day detail.
>
> When her request for change of schedule was filled out it was not stipulated as to how long it was to run for. Therefore, it should not have been allowed to be for more than one day. But, since it was for a legitimate reason and since it has gone this long it will be considered approved.
>
> Should the employee continue on tour two after 1/1/77 [sic] management will be libel [sic] for overtime pay for all hours worked outside of her regular schedule.
>
> Your prompt attention to this matter will be greatly appreciated.

Upon receipt of this letter, Dearing instructed Johnson to terminate Berry's Tour II detail. He told Johnson to explain to her that the Postal Service had "no other option" because the revocation was "a unilateral Union action over which we have no control." On December 28, Johnson advised Berry that her Tour II detail would be terminated effective December 30.

On December 29 and again on December 30, Berry consulted with Dearing about her situation. Because of his sympathy for her, he personally tried to find a solution. At Dearing's suggestion, Berry applied for twenty-four hours of annual leave and up to twenty-seven days of leave without pay, which would allow her to remain at home during the month of January so she could find a new companion for her mother. On December 30, Dearing approved her application, placing her on leave-without-pay status from January 4 until February 8. Berry did not, however, ever report to her drafted Tour I position because in January she bid on and received a permanent position on Tour II.

The National Alliance of Postal and Federal Employees, a rival labor organization to which Berry belonged, filed a charge with the Board on her behalf, alleging that the Union had violated §§ 8(b)(1)(A) and 8(b)(2) of the Act.

Based on the foregoing facts, the Board affirmed the rulings, findings and conclusions of the Administrative Law Judge that the Union, through Clerk Craft President Mooney, breached its duty of fair representation toward Berry, thereby restraining Berry's § 7 rights and violating § 8(b)(1)(A) of the Act. In the Board's view, Mooney's revocation of General President Amann's assent to Berry's temporary shift change, solely because of Mooney's personal views, constituted an arbitrary and capricious exercise of power by the Union in violation of

---

6. Manager Dearing was absent so she presented her request to Acting Distribution Manager Clary.

7. Because the Operations Analyst in charge of Tour I was on leave and could not pass on her request, she was granted a one-week extension on Tour II pending his return, by Johnson.

its duty of fair representation. The Board further found that the Union violated § 8(b)(2) of the Act by causing the Postal Service to terminate Berry's temporary Tour II detail and that the Postal Service violated §§ 8(a)(3) and (1) of the Act by acceding to the Union's arbitrary demand and terminating Berry's temporary detail.

The Board's order requires the Union and the Postal Service to cease and desist from the unfair labor practices found and from in any like or related manner interfering with, restraining or coercing employees in the exercise of their rights guaranteed in § 7 of the Act. Affirmatively, the order requires the Union and the Postal Service to post appropriate notices and to make Berry whole for any loss of earnings she may have suffered by reason of the discrimination. After weighing the equities and the degree of responsibility borne by the parties, the Board determined that the Union should be primarily liable for the loss of earnings.

■ On review, the Board's findings must be sustained if they are supported by substantial evidence on the record considered as a whole. Section 10(e–f), National Labor Relations Act, 29 U.S.C. § 160(e–f) (1970); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Keokuk Gas Service Co. v. NLRB*, 580 F.2d 328, 334 (8th Cir. 1978). Where either one of two inferences may reasonably be drawn from the facts, the court is bound by the Board's findings even though the court could have made a different choice if the matter were before it de novo. *Radio Officer's Union v. NLRB*, 347 U.S. 17, 49–52, 74 S.Ct. 323, 340–42, 98 L.Ed. 455 (1954); *Northern Petrochemical Co. v. NLRB*, 469 F.2d 352, 355 (8th Cir. 1972). However, a Board's findings cannot rest on suspicion, surmise, implications, or plainly incredible evidence. *Independent Gravel Co. v. NLRB*, 566 F.2d 1091, 1094 (8th Cir. 1977); *NLRB v. Garner Tool & Die Manufacturing, Inc.*, 493 F.2d 263, 268 (8th Cir. 1974). In this circuit, the test of an inference drawn by the Board is reasonableness. *Mead & Mount Construction Co. v. NLRB*, 411 F.2d 1154, 1157 n.9 (8th Cir. 1969). "In determining whether there exists substantial evidence on the record as a whole we must view the inherent strengths and weaknesses of the inferences drawn by the Board." *NLRB v. Wal-Mart Stores, Inc.*, 488 F.2d 114, 117 (8th Cir. 1973).

The Board first found that the Union violated § 8(b)(1)(A) of the Act by arbitrarily revoking its approval of Berry's temporary reassignment. It based this conclusion on its finding that Mooney's summary revocation was based, not on legitimate union concerns, but solely on his personal views. The Union contends that, in view of the requirement that the Request for Temporary Change of Schedule was to be signed by a steward, Mooney's action was not arbitrary.

■ Section 8(b)(1)(A) of the Act makes it an unfair labor practice for a union to "restrain or coerce" employees in the rights guaranteed in § 7 of the Act. 29 U.S.C. § 158(b)(1)(A). Section 7 of the Act protects the right of employees to engage in union or other concerted activities or to refrain from such activities. 29 U.S.C. § 157. The rights protected by § 7, however, are limited by the principle of exclusive representation set forth in § 9(a) of the Act. 29 U.S.C. § 159(a). *See Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 61–70, 95 S.Ct. 977, 984–88, 43 L.Ed.2d 12 (1975); *NLRB v. Tanner Motor Livery, Ltd.*, 419 F.2d 216, 218–221 (9th Cir. 1969). In view of the restraints imposed on individual employee rights by the principle of exclusive representation, the Board and the courts have imposed upon unions a reciprocal obligation of the Act to fully and fairly represent all of the employees. *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); *General Truck Drivers Local 315*, 217 N.L.R.B. 616, 619, 89 L.R.R.M. 1049, 1053 (1975), *enforced*, 545 F.2d 1173 (9th Cir. 1976). A union which fails to live up to this obligation unjustifiably restrains employees in the exercise of their § 7 rights and thereby violates § 8(b)(1)(A). *Vaca v. Sipes, supra*, 386 U.S. at 177–78, 181–83, 87

S.Ct. at 909–10, 912–13. The duty of fair representation gives employees a correlative right under § 7 to be represented without arbitrary, irrelevant or invidious discrimination by their exclusive representative. *Kling v. NLRB*, 503 F.2d 1044, 1046 (9th Cir. 1975). Arbitrary conduct alone may suffice to establish a violation of the duty of fair representation. *Griffin v. UAW*, 469 F.2d 181, 183 (4th Cir. 1972); *Smith v. Hussman Refrigerator Co.*, 100 L.R.R.M. 2238, 2244–45 (8th Cir. 1979), reh. en banc, 619 F.2d 1229 (8th Cir. 1980). In evaluating whether union conduct is so arbitrary as to breach the duty of fair representation, so long as a union exercises its discretion in good faith and with honesty or purpose, a "wide range of reasonableness must be allowed." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). Mere negligence, poor judgment or ineptitude are insufficient to establish a breach of the duty of fair representation. *Id.* On the other hand, a union may not impair individual employee interests on the basis of personal preferences. *Branch 6000, National Ass'n of Letter Carriers v. NLRB*, 194 U.S. App.D.C. 1, 4–6, 595 F.2d 808, 811–13 (D.C. Cir.1979); *Griffin v. UAW, supra*, 469 F.2d at 183. And, if a union representative makes no effort to communicate with the persons directly affected by its actions and takes action without investigation or adequate notice and opportunity to be heard, these acts and omissions may constitute a breach of the duty of fair representation. *See Minnis v. Auto Workers*, 531 F.2d 850, 853–54 & n.9 (8th Cir. 1975); *Retana v. Apartment, Motel, Hotel & Elevator Operators Union Local 14*, 453 F.2d 1018, 1024 (9th Cir. 1972).

Berry's request for a schedule change was within the terms of the Gamser Award. It was motivated by personal circumstances. She was not accommodating the Postal Service, nor were her interests in conflict with those of any other employee. Berry provided the Union with the pertinent information, and the Union, through its General President, approved her request. The Union has never suggested that any Union official could have done otherwise. However, Mooney abruptly revoked Berry's schedule change. The issue before us is whether Mooney's action was so arbitrary as to amount to a violation of the Union's duty of fair representation. Such arbitrariness may be shown by either the unreasonableness of his action or the procedure he followed.

Although the only reason given in Mooney's letter was the lack of a date, the Union offered three rationalizations for Mooney's action. The Board rejected all three rationalizations.[8] First, Berry's request was not time-certain. However, no procedures for filling out the form were ever published by the Union, and it was processed by the usual people; but, even if Berry's request had a formal defect, Mooney's letter reveals his awareness that she "had requested a 60 day detail." Second, Berry's request was not signed by the appropriate steward. However, in his role as General President of the Union[9] Amann had apparent authority to approve the request. *See NLRB v. Skelly Oil Co.*, 473 F.2d 1079, 1084 (8th Cir. 1973). None of the usual processors saw anything irregular about the way the Union's approval was

---

8. Mooney also testified that he cancelled Berry's reassignment as part of an "oral" grievance procedure. The ALJ found Mooney's testimony on this point "obscure" and "self-contradictory" and concluded: "In the circumstances herein, I consider it generous to conclude either that Mooney's reference to such an employee complainant is a fiction or that the testimony of such an .employee would be adverse to the Union's cause." The ALJ also stated: "It is implausible . . . that if there had actually been a grievance resolution as described by Mooney he would not have men-

tioned it in his December 23 letter." There is no merit in the Union claim that termination of Berry's reassignment was based upon resolution of a grievance.

Furthermore, if a grievance resolution had been reached on these grounds and in this manner, it would have been arbitrary discrimination in violation of the duty of fair representation.

9. Amann was also a steward but not of Berry's work location.

obtained. In fact, because lack of authorization was not mentioned in Mooney's letter, there is no reason to believe that he would have responded differently if the appropriate steward had signed it. Third, there was a 30-day limit on schedule changes. However, the 30-day limit was not a union policy,[10] but a personal policy which Mooney did not follow consistently.[11]

■■■■■ The Union argues that the Board's conclusion of arbitrariness was not supported by the ALJ's findings because the ALJ found that Mooney was not "motivated by antagonistic personal or interunion considerations." However, without any hostile motive of discrimination and in complete good faith, a union may pursue a course of action that is so unreasonable and arbitrary as to constitute a violation of its duty of fair representation. *Griffin v. UAW, supra,* 469 F.2d at 183. After stating, "the record is susceptible to a conclusion that Mooney's conduct was designed to advance a legitimate union purpose . . .," the ALJ went on to find "something more"[12] than negligence. The something more that he found was Mooney's "impulsive and fanciful" reaction to an infraction of his 30-day policy even though he knew that Berry's request had been approved by the Union (Amann's signature), that she was relying on that approval, and that she might be forced to resign if the approval were withdrawn. Clearly, the Union, through Mooney, impaired Berry's interests on the basis of his personal preferences. As the Board found:

> That Mooney's view may have been grounded in legitimate union concerns does not make it any less a personal view,

nor does it render his imposition of his view any less subjective and arbitrary. If our dissenting colleague's position prevailed, a union official could lawfully overrule any decision properly made by the Union and relied on by employees provided the official was motivated by "what he thought was good union policy." Yet this clearly would result in arbitrary, capricious, and unfair actions in violation of the duty of fair representation.

Therefore, the Board's conclusion is based upon the ALJ's findings and is supported by substantial evidence on the record viewed as a whole.

Moreover, even if the technical defects in Berry's request had justified its revocation, another critical issue remains—whether, upon discovery of the purportedly unauthorized act, Mooney followed a procedure that was consistent with the Union's duty of fair representation. Mooney suddenly withdrew approval for the remaining portion of the sixty days without consulting Berry[13] or making any attempt to accommodate her personal needs, with which he was familiar from her request. He did not even notify her before directing the Postal Service to cancel her detail. She learned of the cancellation from the Postal Service on December 23, immediately before the Christmas holidays and only eight days before she was to report to her assignment on the night tour, so that she had little or no chance of adapting to the schedule change in time. Nor did Mooney make any attempt to investigate the circumstances under which Berry's request was approved or by whom. Mooney did not exercise his responsibility within the limits imposed by the

---

10. Member Truesdale, dissenting, thought that Mooney was motivated by what he thought was union policy, although he was "mistaken" and "insensitive." Mooney's constituents turned him out of office at the next election.

11. Six weeks after he invoked his 30-day limit against Berry, Mooney approved a temporary schedule change of eleven months for another employee.

12. *Quoting Teamsters Local 692 (Great Western Unifreights Sys.),* 209 N.L.R.B. 444, 446 (1974).

This case does not, as the Union urges, stand for the proposition that the "something more" must be discrimination based on race, color, national origin, age, sex, or union affiliation.

13. The Union's assertion that Berry caused her own problems by failing to deal with the Union directly can hardly be countenanced. An employee's ignorance of unpublished procedures and personal policies cannot lessen the Union's duty of fair representation.

duty of fair representation. Therefore, alternatively, the Union violated its § 8(b)(1)(A) duty of fair representation by failing to communicate with Berry and taking action without investigation.

██ The Board also found that the Union violated § 8(b)(2) of the Act by causing the Postal Service to discriminate against Berry on an arbitrary or irrational ground. It based this conclusion on the ALJ's finding that Mooney's letter could reasonably be construed as a threat to invoke the Gamser Award "as the basis for potential legal or economic action against the employer." The Union contends initially that the Board improperly concluded that there was a violation of § 8(b)(1)(A), and, therefore, there can be no violation of § 8(b)(2). For the reasons discussed above, this contention fails. Additionally, the Union contends that finding a § 8(b)(2) violation requires evidence in the record upon which the Board can conclude that the intent of the action taken by the union was to encourage membership in the union.

Section 8(a)(3) of the Act prohibits an employer "by discrimination in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Under § 8(b)(2) of the Act, it is unlawful for a union "to cause or attempt to cause an employer to discriminate against any employee in violation of § 8(a)(3)." 29 U.S.C. § 158(b)(2). The Board and the courts have held that when a union causes an employer to discriminate against employees on an irrational or arbitrary ground, this conduct constitutes unlawful encouragement of union activity within the meaning of §§ 8(b)(2) and 8(a)(3). *Barton Brands, Ltd. v. NLRB,* 529 F.2d 793, 799 (7th Cir. 1976), *on remand,* 228 N.L.R.B. 889, 891–93 (1977); *Kling v. NLRB, supra,* 503 F.2d at 1046; *NLRB v. International Longshoremen's Ass'n Local 1581,* 489 F.2d 635, 637 (5th Cir.), *cert. de-*

*nied,* 419 U.S. 1040, 95 S.Ct. 527, 42 L.Ed.2d 316 (1974). The foreseeable intimidating effect on the workers is examined; specific evidence of an intent to encourage union membership is not essential. *Radio Officers Union v. NLRB, supra,* 347 U.S. at 52, 74 S.Ct. at 341. This circuit has said, "In our judgment, the better view is that a union violates § 8(b)(1)(A) and (2) of the Act if it or its agent adversely affects an employee's job for purely personal or arbitrary reasons." *Fruin-Colnon Corp. v. NLRB,* 571 F.2d 1017, 1023 (8th Cir. 1978).

The Union's actions in this case contained all the elements of a § 8(b)(2) violation. The requirement that the Union approve all "Request for Temporary Schedule Change for Personal Convenience" forms afforded the Union an opportunity to exercise power over an employee at a time when she was extremely vulnerable. The exercise of this power caused the employer to discriminate against Berry in regard to the terms and conditions of employment, that is, she was treated differently from others who had temporary schedule changes. The Union caused the employer to discriminate by threatening the employer with economic and legal sanctions. The discrimination resulted in personal hardship and economic loss to the employee. Here, Berry suffered a loss of income while she was on leave-without-pay status, but, had Manager Dearing not intervened, she could have lost her job entirely. As discussed above, the Union's action was for purely personal or arbitrary reasons. And, finally, it was foreseeable that the discrimination would have an intimidating effect on other employees as well as on Berry, especially since Berry was an active member of a rival union which she served both as an officer and as editor of its newsletter. Where the foreseeable effect of the Union's action was to stimulate employees to ingratiate themselves with the Union,[14] it was not necessary to prove that

---

14. The Union cannot defend its action by saying that the employees did not know whether union rivalry was the reason why Berry was the target of the Union's arbitrary action.

[T]hey also don't know that it wasn't. History teaches us that it is precisely this kind of fear and uncertainty that encourages people to be servile to those who can wield arbitrary power.

the Union's calculated intent was to encourage union membership.[15] Therefore, the Board's conclusion that the Union violated § 8(b)(2) is supported by substantial evidence in the record.

As to the Postal Service, the Board found that it violated § 8(a)(3) and (1) of the Act because it knowingly acquiesced in the Union's action. This was based on the ALJ's finding that the Postal Service should have known that Amann's approval was valid and Mooney had no authority to revoke it or, in the alternative, should have known that Mooney's revocation was arbitrary and violated the Union's duty of fair representation. In other words, the ALJ decided that the Postal Service discriminated against Berry primarily because the Union requested that it do so. The Postal Service argues, however, that it acted consistently with the National Collective Bargaining Agreement and the Gamser Award.

█ Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). However, finding a violation of § 8(b)(2) of the Act by the union's causing the employer to alter an employee's working conditions for arbitrary reasons does not mandate finding a per se violation of § 8(a)(3) by the employer. *NLRB v. Iron Workers Local 433*, 600 F.2d 770, 101 L.R.R.M. 3119 (9th Cir. 1979); *United Steelworkers*, 243 N.L.R.B. No. 162, 101 L.R.R.M. 1593, 1595–96 (1979).

█ The District of Columbia Circuit recently summarized the burden of proof in a § 8(a)(3) case, as set out in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), as follows:

*N. L. R. B. v. Great Dane Trailers, supra,* involved a violation of §§ 8(a)(3) and (1) of the Act where an employer refused to pay vacation benefits to striking employees accrued under a terminated collective bargaining agreement and, at the same time, the employer announced that it would pay these benefits to striker replacements, returning strikers and nonstrikers who worked on July 1, 1963 during the strike. In *Great Dane Trailers* the Board and the Fifth Circuit held that discrimination between striking and nonstriking employees had been established, but the Fifth Circuit ruled that an affirmative showing of an unlawful motivation to discourage union membership or interfere with the exercise of protected rights were required. *Great Dane Trailers* made no effort to show any legitimate business purpose underlying its discriminatory action but the Fifth Circuit speculated that its motivation may have been (1) to reduce expenses; (2) to encourage longer tenure among present employees; or (3) to discourage early leaves immediately before vacation periods. The court of appeals denied enforcement of the order because of the possibility that such motives were sufficient to overcome the inference of improper motive which flowed from the conduct.

The Supreme Court reversed, holding that discrimination had clearly been shown in this § 8(a)(3) charge and, under the circumstances, since the conduct fell within the "inherently destructive" category, the employer has the burden of explaining away, justifying or characterizing "his actions as something different than they appear on their face," and if he fails, "an unfair labor practice charge is made out." The Supreme Court went further and said that even if the employ-

---

*NLRB v. Miranda Fuel Co.*, 326 F.2d 172, 180–86 (2d Cir. 1963) (Friendly, J., dissenting).

**15.** The ALJ relied on the language of the Board majority in *Miranda Fuel* which interpreted *Radio Officers Union* to hold that "given such a 'foreseeable result' the finding of a violation may turn upon an evaluation of the disputed conduct in terms of legitimate employer or un-

ion purposes." 140 N.L.R.B. 181, 187–88, *enforcement denied*, 326 F.2d 172 (2d Cir. 1963).

Such an evaluation would seem to be subsumed in this circuit's view that the disputed conduct is for "purely personal or arbitrary reasons." *Fruin-Colnon Corp. v. NLRB, supra,* 571 F.2d at 1023.

er comes forward with counter explanations for his conduct, the Board may nevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted business justification and the invasion of employee rights. The Court then announced two principles: (1) if it can be reasonably concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations; and (2) if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge if the employer comes forward with evidence of legitimate and substantial business justifications for the conduct. In either situation, the Supreme Court said, once discriminatory conduct which could adversely affect employee rights to *some* extent has been shown, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him. *Service Employees Local 250 v. NLRB*, 195 U.S.App.D.C. 116, 600 F.2d 930, 101 L.R.R.M. 2004, 2010 n.22 (D.C.Cir.1979). This Circuit has applied the balancing test from *Great Dane. E. g., Fruin-Colnon Corp. v. NLRB, supra,* 571 F.2d 1017. Conduct is "inherently destructive" when it burdens future exercise of employee rights, such as employer conduct arising from strikes and lockouts. *Loomis Courier Service v. NLRB,* 595 F.2d 491, 101 L.R.R.M. 2450, 2452 (9th Cir. 1979); *Inter-Collegiate Press, Graphic Arts Division v. NLRB,* 486 F.2d 837, 845 (8th Cir. 1973). Conduct which is sanctioned by the collective bargaining agreement is not "inherently destructive."

*NLRB v. Wilson Freight,* 604 F.2d 712, 102 L.R.R.M. 2269, 2279 (1st Cir. 1979). A good faith interpretation of the contract by the employer does not violate § 8(a)(3) and (1). *NLRB v. Cameron Iron Works,* 591 F.2d 1, 100 L.R.R.M. 3005 (5th Cir. 1979). And, in the absence of clear bad faith by the union, the employer can rely on the written expression of its collective bargaining partner. *Fruin-Colnon Corp. v. NLRB, supra,* 571 F.2d 1017.

▮▮▮▮ In cases of "comparatively slight" harm, employer motive will be determinative of whether there was a violation. *NLRB v. Brown,* 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965). The employer violates § 8(a)(3) and (1) "if it knowingly acquiesces in the union's action." *Fruin-Colnon Corp. v. NLRB, supra,* 571 F.2d at 1023; *Lummus Company v. NLRB,* 119 U.S.App.D.C. 229, 238, 339 F.2d 728, 737 (D.C.Cir.1964) ("has actual notice or may reasonably be charged with notice"); *International Union of Electrical, Radio & Machine Workers, Frigidaire Local 801 v. NLRB,* 113 U.S.App.D.C. 342, 347, 307 F.2d 679, 684 (D.C.Cir.), *cert. denied,* 371 U.S. 936, 83 S.Ct. 307, 9 L.Ed.2d 270 (1962) ("had reasonable grounds for recognizing and should have recognized"). If the employer participates in what it knows is an unfair labor practice, it is no defense that its participation was an unwilling response to union pressure. *NLRB v. Glueck Brewing,* 144 F.2d 847, 853–54 (8th Cir. 1944). The Board may not divine the employer's motive, but must look at the evidence in the record. *NLRB v. Wells Fargo Armored Service Corp.,* 597 F.2d 7, 101 L.R.R.M. 2209, 2212 (1st Cir. 1979); *Sioux Quality Packers Division of Armour & Co. v. NLRB,* 581 F.2d 153, 156–57 (8th Cir. 1978); *Independent Gravel Co. v. NLRB,* 566 F.2d 1091 (8th Cir. 1971).

▮▮▮▮ Because Berry did come forward with evidence of discriminatory conduct [16] which adversely affected her employee

---

**16.** The ALJ recognized that Berry was treated in exactly the same way as Dearing had two months earlier treated an employee with a similar situation, to whom he granted a 30-day leave of absence.

The different, or discriminatory, conduct relates only to the Union's revocation of the reassignment.

rights, we proceed with the burden of proof analysis set out in *Great Dane*. The conduct complained of here was not "inherently destructive" of important employee rights; that is, it was sanctioned by the collective bargaining agreement, and it did not grow out of a strike or lockout so as to burden future exercise of employee rights. Rather, its effect was "comparatively slight" because a single employee achieved the desired delay in reporting to her new assignment in a contractually sound way which did not effect her hire or tenure, although it resulted in a month of leave without pay. Therefore, we must balance employee rights against employer motive. The burden shifts to the employer to come forward with evidence of legitimate and substantial business justifications for its conduct. The ALJ affirmatively concluded that legitimate and substantial employer justifications existed. The Postal Service had to honor the Union's demand to avoid liability for the following: (1) breach of Article VIII, § 4(b) of the 1975 National Agreement and the Gamser Award, (2) payment of overtime to Berry for work performed outside the hours of her draft bid assignment, and (3) violation of § 8(a)(5) of the Act by implementing, in effect, a side arrangement with Berry to excuse her unilaterally from Article VIII, § 4(b) of the 1975 National Agreement. The ALJ stated,

> I consider Mooney's letter a threat to invoke the arbitrator's decision as the basis for potential legal or economic action against the employer . . . . It is reasonable to conclude that, confronted with Mooney's demand, based as it was upon the Gamser award, it would have been a futile gesture for him [Dearing] to have protested Mooney's request for termination of Berry's assignment.

Yet, in the face of his own apparently determinative conclusion about legitimate employer justifications, the ALJ found improper motivation thusly:

> Despite my conclusion that "legitimate employer purposes" existed herein, I do not find the Employer to have terminated Berry's temporary assignment based upon them. In short, I am unable to conclude Dearing actually was motivated as much as the Employer's brief contends by concern for adherence to either the arbitration award or the need to reduce overtime costs. Logic dictates a different conclusion, which is proved by analysis of how Dearing reacted to Mooney's December 23 letter. What Dearing did was simultaneously upon receipt of the December 23 letter yield to the request to terminate the temporary assignment. This was done in the framework of Amann's prior assent to Berry's request and exoneration of the Employer for overtime liability. What would have been Dearing's reaction had yet another Union official (not Amann or Mooney) subsequently (after December 23) repudiated Mooney's demand to terminate the assignment and reverted to the original position of APWU? Based upon the demonstrated reaction of Dearing to Mooney's letter, it is not unreasonable to assume that the latter postulation would have resulted in reinstatement of Berry's 60-day temporary assignment in full. Viewed in this posture, I conclude that Dearing's revocation of Berry's assignment was principally predicated upon the APWU request rather than the contractual or economic consequences expounded by the Employer's able counsel. Upon the foregoing, therefore, I find the "legitimate employer purpose" theory inapposite.

The ALJ found that Dearing terminated Berry's temporary assignment simply to accommodate the Union. This finding cannot stand. There is no evidence in the record of what Dearing would have done if a different Union official had countermanded Mooney's demand. The ALJ posed a hypothetical for himself, divined what Dearing's response might have been, and then inferred a motive for it. We have said that the Board "may not build inferences on inferences to reach a finding which is no more than educated conjecture." *NLRB v. Garner Tool & Die Manufacturing, Inc., supra*, 493 F.2d at 268. This is not a situation where either one of two inferences could reasonably be drawn from the evidence. This is a classic example of a Board finding

which rests on surmise. We are not bound by such a finding. The only reasonable conclusion from the evidence in the record is that the Postal Service acceded to the Union's demand because it believed its compliance was compelled by the Collective Bargaining Agreement and the Gamser Award. It was motivated by the legitimate and substantial business justification.

Finally, the business justification defense would be of no avail if the discriminatory conduct had been "knowing." Dearing was obviously aware of the hardship to Berry of the Union's action as shown by the initiative he took in arranging her leave-without-pay status. However, neither the ALJ nor the Board made a finding that Dearing knew the Union's action violated its duty of fair representation.[17] On the contrary, the ALJ noted that there were "no allegations or proof of so-called independent 8(a)(1) allegations or other direct evidence of a discriminatory motivation by the Employer." Therefore, this case is distinguishable from *Fruin-Colnon Corp.* and *Glueck Brewing* where the respective employers were drawn into union activities which they knew at the outset were illegal. Compare also *Wismer and Becker, Contracting Engineers,* 228 N.L.R.B. 779 (1977).

The Board's finding that the Postal Service violated § 8(a)(3) and (1) is not supported by substantial evidence on the record. Accordingly, the Postal Service's petition for set aside of the Board's order finding a violation of § 8(a)(3) and (1) is granted. The Board's order is enforced insofar as it found violations of § 8(b)(1)(A) and § 8(b)(2) by the Union, and the Union's petition for set aside is denied.

---

**17.** The ALJ did suggest that Dearing could have chosen to ignore Mooney's letter, but even the possible implication that Dearing could have guessed that Amann had apparent authority is pure hindsight and falls far short of a finding that he knew or should have known that the Union's actions violated its duty of fair representation. In fact, the ALJ recognized that Dearing's ignoring Mooney's letter would have surely resulted in a grievance or refusal to bargain charge by the Union. Such a Hobson's choice is not to be taken seriously. Even more importantly, we do not wish to encourage employers to breach collective bargaining agreements on the basis of unschooled legal opinions by local management.