**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNA-MENTAL IRONWORKERS, LOCAL 11, AFL–CIO, Respondent.**

No. 88–3234.

United States Court of Appeals, Third Circuit.

Argued Oct. 7, 1988.

Decided Jan. 9, 1989.

Susan L. Williams, Supervising Atty., Steven B. Goldstein (argued), N.L.R.B., Washington, D.C., Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, for petitioner.

Kenneth I. Nowak (argued), Zazzali, Zazzali, Fagella & Nowak, Newark, N.J., for respondent.

Before HIGGINBOTHAM, MANSMANN and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

In this case, Petitioner the National Labor Relations Board ("the Board"), seeks enforcement of its July 31, 1987, Supplemental Order directing Respondent Local 11 of the International Association of Bridge, Structural, and Ornamental Ironworkers ("Local 11" or "the Union") to cease discriminating, in the operation of its exclusive hiring hall, against six ironworkers [1] who are not members of Local 11, in violation of § 8(b)(1)(A) and (b)(2) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(b)(1)(A), (b)(2) (1982).[2] The

---

1. The charging parties are Peter DeMaio, Michael Fearns, Ralph Grisi, Anthony Pontrelli, Joseph Tafro and Victor Tafro.

2. The section provides in pertinent part:
   (b) It shall be an unfair labor practice for a labor organization or its agents—
      (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in sec-

tion 157 of this title [relating to the right of employees to organize and bargain collectively.]
. . . .
   (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section [generally proscribing discrimination in regard to hire or tenure of employment, or any

Board's order also mandates that the Union make the named discriminatees whole for their lost earnings. Local 11 maintains that the Board's findings of discrimination are not supported by substantial evidence. This court has jurisdiction pursuant to 29 U.S.C. § 160(e) (1982).

Because we believe that the Board lacked substantial evidence for finding that Local 11 discriminated against the named non-members on the basis of the out-of-turn referrals of minority union members, we will grant the enforcement order in part, and deny it in part.

## I.

This action has a rather long and procedurally complex history, much of which has already been discussed in our previous opinion, *NLRB v. Local 483 and Local 11, Int'l Ass'n of Bridge, Structural, and Ornamental Ironworkers, AFL–CIO*, 672 F.2d 1159 (3d Cir.1982) (*"Ironworkers I"*). To the extent that it is necessary to a complete understanding of our disposition of the present appeal, we review that history.

Local 11 operates an exclusive hiring hall pursuant to a collective bargaining agreement ("the Agreement") between member locals of District Council of Northern New Jersey, International Association of Bridge, Structural and Ornamental Ironworkers, AFL–CIO ("the District Council") and the Building Contractors Association of New Jersey. The Agreement, which was in force at all relevant times, provided in pertinent part that

> [e]very Employer bound hereby agrees that he will recruit all employees covered hereby exclusively through the several hiring halls operated by the Union and/or its Locals. The said hiring halls shall be operated by the Union and its Locals in a non-discriminatory manner and on a non-discriminatory basis in accordance with the said Decree in U.S. v.

Plumbers Local 24 et al Civil Action No. 444–71 etc....

> The said Hiring Halls shall be operated in accordance with the provisions of said Decree mentioned in the preceding Article.

Agreement, art. XV, *reprinted in* Joint Appendix ("Jt.App.") at 204–205. The consent decree referred to in the Agreement was entered in 1972 as part of the settlement of an employment discrimination suit brought by the United States against the District Council and others under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982) ("Title VII"). Under the terms of the consent decree, a worker referral system was implemented in order to prevent future discrimination.

The operation of the worker referral system was well summarized in *Ironworkers I:*

> The gist of the system is that any ironworker, whether a member of the local or not, may request referral at the hiring hall and must be referred to a job in the chronological order of his request. In order to ensure fairness, the consent decree requires that each local maintain two bound registers: a "Referral Register" and a "Contractor's Requisition Register." An ironworker seeking referral comes to the hiring hall and signs the referral register with his name, the date, his union affiliation, and the ironworker skills ... in which he is qualified. When a contractor calls to request workers, the requisite number of those available who have the needed skills are called in the order in which they signed the register.... [T]he contractor ... and the names of those workers referred are entered in the contractor's requisition register. When the job is completed, the workers must return to the hall, re-sign the register, and await another referral.

*Ironworkers I*, 672 F.2d at 1162.

There are, however, several exceptions to the referral scheme, two of which are crit-

term or condition of employment, that tends to encourage or discourage union membership] or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated

on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.
29 U.S.C. § 158(b)(1)(A), (b)(2) (1982).

ical to the disposition of the present appeal. First, "an applicant may be referred out of chronological order if a contractor requests the applicant by name." Consent Decree ¶ 27(c), *reprinted in* Jt.App. at 146. When this special request is made, it must be recorded in the "remarks" column of the referral register, and the union is to "request written confirmation from the contractors of each request or referral of applicants by name." *Id.* Second, "[c]ontractors who are obligated to meet ... affirmative action requirements ... may request qualified ironworkers, specifying the race of the workers needed." Consent Decree ¶ 27(h), *reprinted in* Jt.App. at 147.

In *Ironworkers I,* the Board sought enforcement of its order, based upon the recommendations of the Administrative Law Judge (ALJ), directing Locals 11 and 483 of the District Council to cease discriminating against the named non-members, and all others similarly situated, in the operation of their hiring halls. In that action, the Board relied upon a series of earlier *Ironworkers* cases,[3] in which it "found widespread discrimination by the locals in favor of their own members, highlighted by grossly disproportionate referral statistics and what the Board found to be an 'inescapable inference of deceit' in maintaining the referral register." *Ironworkers I,* 672 F.2d at 1163. We found, however, that the case did not present the same "unique and overwhelming factual situations" of the earlier cases, and that the Board's summary findings[4] of discrimination did not "permit the respondents to mount a meaningful defense and this court to perform a mean-

ingful review." *Id.* at 1165. Thus, we denied the application for enforcement and referred the matter back to the Board for any further proceedings and more detailed factual findings as it deemed appropriate.

The Board then remanded the case to the ALJ for the purpose of reconsidering his initial decision in light of our opinion. Thereafter, the ALJ found that insufficient evidence existed to charge Local 483 with any violations of the Act.[5] However, the ALJ determined that enough substantial evidence existed to charge Local 11 with discrimination against both the named discriminatees and those similarly situated. In making this determination, the ALJ "presumed that any member belonging to a minority group [had] been referred legitimately, even though bypassing a named discriminatee." *Ironworkers, Locals 483 and 11,* ALJ's Supplemental Decision at 6 (Mar. 23, 1984), *reprinted in* Jt.App. at 62.

After reviewing the ALJ's findings, the Board decided to remand the matter once again because the ALJ had "failed, contrary to the court's direction, to consider, or explain why he did not consider, either Local 11's Contractor Requisition Registers or the 'substantial live testimony' of Local 11's officials regarding the referral system in finding that Local 11 had engaged in a systematic pattern of discrimination against nonmembers...." *Ironworkers, Locals 483 and 11,* Order Remanding Proceeding to the Administrative Judge at 2 (Oct. 1, 1984), *reprinted in* Jt.App. at 90. The Board also disagreed with the ALJ's

3. Ironworkers, Local 480, 235 N.L.R.B. 1511 (1978), *enforced,* 598 F.2d 611 (3d Cir.1979) (unpublished order); Ironworkers, Local 373, 235 N.L.R.B. 232 (1978), *enforced,* 586 F.2d 835 (3d Cir.1978) (unpublished order); Ironworkers, Local 45, 232 N.L.R.B. 520 (1977), *enforced,* 586 F.2d 835 (3d Cir.1978) (unpublished order); Ironworkers, Local 45, 232 N.L.R.B. 504 (1977), *enforced,* 586 F.2d 834 (3d Cir.1978) (unpublished order).

4. The Board had wholeheartedly endorsed the findings of fact and recommendations of the ALJ. However, we noted that

the ALJ ... went through the referral register in summary fashion listing the total number of times that each named charging party was bypassed, without reference to, or discussion

of, each specific instance. Further any purported explanation or justification of a bypassing, other than an actual request letter, was either rejected outright by the ALJ or held to be relevant only to the issue of damages in the subsequent compliance proceeding. Nowhere in the ALJ's opinion is there any discussion of the contractor's requisition registers.

*Ironworkers I,* 672 F.2d at 1163–64.

5. The Board ultimately agreed with the ALJ and, consequently, Local 483 was not charged with any violations of the Act in the Board's Supplemental Order of July 31, 1987. Thus, Local 483 is not a party in this appeal.

decision regarding the legitimacy of minority out-of-order referrals, remanding with instruction "that in the absence of any supporting testimonial or documentary evidence whatsoever it may not be presumed that the out-of-turn referrals of minority members were in fact 'minority requests' under the Title VII consent decree." *Id.* (footnote omitted).

Taking into account the Board's directives on second remand, the ALJ again found that Local 11 had engaged in systematic discrimination against nonmembers, in addition to the specific contraventions of the Act with respect to the named discriminatees. However, the ALJ determined that there was an absence of testimonial and documentary evidence to support the out-of-turn minority referrals since they were not entered in the contractor requisition registers and Local 11 did not contend their validity during the evidentiary hearing. *Ironworkers, Locals 483 and 11*, ALJ's Second Supplemental Decision at 3 (Aug. 23, 1985), *reprinted in* Jt.App. at 93. Upon review, the Board concluded that the case record still failed to establish by "overwhelming numerical and statistical evidence" that Local 11 engaged in systematic discrimination of nonmembers, and therefore decided to dismiss that allegation. *Ironworkers, Locals 483 and 11*, 285 N.L.R.B. No. 20, at 5 (July 31, 1987), *reprinted in* Jt.App. at 107. However, with respect to the named non-members, the Board found that on its "examination of the referral books, contractors requisition registers, and the record ... Local 11 violated Section 8(b)(1)(A) and (2) of the Act ... by affording preferential treatment to its own members." *Id.* at 4–5, *reprinted in* Jt.App. at 106–07 (footnotes omitted).

The Board now applies to this Court for enforcement of its Supplemental Order.

## II.

We begin our analysis by noting that, in *Ironworkers I*, this Court held that "a union may lawfully refer one worker ahead of another for any good faith reason which is neither arbitrary nor based on union membership or activity." 672 F.2d at 1165 (footnote omitted). We further explained that

> [t]he fact that that reason is not embraced by the Title VII consent decree does not change this. Thus, "requested" referrals without a supporting letter, "recalled" or "returned to work" referrals, or even *unexplained out-of-order referrals*, all of which might in some circumstances constitute persuasive evidence of discriminatory intent, do not in themselves constitute violations of the Act *unless and until* the Board finds by substantial evidence that the referral was in fact based upon union membership or activity and that the purported justification, if any, is mere pretext.

*Id.* (footnote omitted) (emphasis added).

The *Ironworkers I* court clarified that the mere fact that a union referred some members over nonmembers will not suffice to prove a violation of § 8(b)(1)(A) and (b)(2). "It is the 'true purpose' or 'real motive' in hiring or firing [or, in this case, referral] that constitutes the test." *Teamsters Local 357 v. NLRB*, 365 U.S. 667, 675, 81 S.Ct. 835, 839, 6 L.Ed.2d 11 (1961). Thus, there must be a showing of intentional discrimination, and the Board's finding must be supported by substantial evidence on the record considered as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Metropolitan Edison Co. v. NLRB*, 663 F.2d 478, 484 (3d Cir.1981).

█ However, the substantial evidence needed to prove discrimination based upon union membership does not have to demonstrate specific intent. Indeed, "[s]ome conduct may by its very nature contain the implications of the required intent; the natural foreseeable consequences of certain actions may warrant the inference." *Teamsters Local 357*, 365 U.S. at 675, 81 S.Ct. at 839. In reviewing a violation of § 8(a)(3) [6] of the Act, the Court also held

---

**6.** Title 29 U.S.C. § 158(a)(3) (1982) generally proscribes an employer from encouraging or discouraging union membership by discrimination with respect to hiring or tenure of employment or any term or condition thereof.

that where the challenged action "inherently encourages or discourages union membership, ... specific evidence of intent ... is not an indispensable element of proof." *Radio Officers v. NLRB*, 347 U.S. 17, 44–45, 74 S.Ct. 323, 338, 98 L.Ed. 455 (1954). Moreover, we recently noted, in *International Brotherhood of Electrical Workers, Local 211 v. NLRB*, 821 F.2d 206 (3d Cir. 1987) (*"IBEW"*), that "although the Board lacked a 'smoking gun' with which to show discriminatory intent, the recurring failure of the Union to adhere to its hiring hall procedures sufficed to require a defense to the Board's case." *Id.* at 210.

■ In the absence of specific evidence of discriminatory intent, *Ironworkers I* established a two-pronged test. First, the Board has to come forward with a factual basis that supports its claim that the referrals were based on union membership. Second, the Board must find that the union's purported justification, if any, is merely pretext. Put another way,

> the Board could find that on a given day local member A was referred ahead of non-member B; that, for articulated reasons, the facts compel the conclusion that the reason was union membership; and, explaining the basis for its conclusion, that the Union's explanation, if any, is not credible. If such findings are supported by substantial evidence on the record as a whole, the Board's remedial order would be enforceable by this court.

672 F.2d at 1165.

■ Here, the record reveals that five of the individual charging parties[7] were turned down for union membership in April of 1975, although they were members of ironworkers locals in other states at the time. They then had to hire private counsel and litigate for two years before an order of the New Jersey Superior Court finally granted them membership. Furthermore, union members bypassed them numerous times between February 10, 1976, and April 19, 1977, the period covered

in their charge of discrimination. In our view, these facts constitute substantial evidence of union activity likely to have a discriminatory impact in violation of the Act. In *IBEW*, where two nonmembers also were denied union membership and were repeatedly by-passed, we held that "[p]resented with this evidence, the Board could rationally infer in light of its experience an unlawful attempt to restrain [the charging parties'] rights of organization" in violation of § 8(b)(1)(A) of the Act. 821 F.2d at 211. In addition, "the Board reasonably could conclude that the Union's actions effectively demonstrated its power among the other non-union workers and, thereby, prodded them to join the IBEW" in violation of § 8(b)(2) of the Act. *Id.*

Having ascertained that a factual basis exists from which the Board could reasonably find that Local 11's practices resulted in violations of the Act, we must now address the second part of the two-pronged test developed in *Ironworkers I:* whether there exists any legitimate explanation for the union's actions.

### III.

#### A.

■ The first issue that we must resolve is whether the Board erred in finding that the unexplained out-of-turn referrals of minority union members were not justified by the Title VII consent decree. Local 11 asserts that these out-of-turn referrals of minorities, although not properly documented in the registers, could be presumed to have been made pursuant to the affirmative action exception set forth in the consent decree. Moreover, Local 11 contends that that exception incorporated a subsequent federal court order that required Local 11 to refer minority apprentices and trainees to job sites in Newark, New Jersey, where the "vast majority" of

---

7. The record before us does not indicate that charging party Ralph Grisi was turned down for membership. We need not decide, however, whether substantial evidence supports Grisi's claim since all the union members who by-

the disputed referrals were sent.[8] In support of its contention that minorities were referred out-of-order to fulfill affirmative action requirements and not because of animus towards nonmembers, Local 11 argues that minorities by-passed not only the named nonmembers, but also *union members* who had similar skills.

The Board contends that Local 11 "was permitted to make out-of-order referrals of minorities *only if* an employer, who was obligated to meet affirmative action requirements, requested a minority." Brief for Petitioner at 25 (emphasis in original). In the absence of any evidence showing that such requests were made, the Board asserts that the out-of-turn referrals of minorities cannot be presumed to have been in fulfillment of affirmative action requirements. The Board also argues that regardless of Local 11's duty to make minority referrals in the Newark area, it was still obligated to record the reasons for these referrals under the consent decree's established procedure for operating the hiring hall. It contends further that—for the purpose of proving non-discriminatory motive—the fact that minorities also by-passed union members is irrelevant. Lastly, the Board argues that "[w]here, as here, it appears that the employees were not aware that the [minorities] who bypassed the nonmember discriminatees also by-passed members, the union's arbitrary actions are likely to encourage union membership." Brief for Petitioner at 29.

■ In this case, the Board has determined that the out-of-turn minority referrals cannot be presumed to have been made pursuant to the affirmative action exception since they were not properly recorded as "minority requests." While we do not doubt that such a recording would have clearly shown the motivation behind these referrals, we read *Ironworkers I* as holding that even a referral outside of the consent decree's established procedure is permissible as long as there is a "good faith reason" to support it. 672 F.2d at 1165. Indeed, *Ironworkers I* made clear that, under the "request-by-name" exception, even if Local 11 failed to get a supporting letter from a contractor, confirming that the worker was specifically requested by name, that failure was not, *ipso facto*, a violation of the Act. *Id.*[9]

The intent of the Title VII consent decree—to prohibit Local 11, its sister unions, and contractors from discriminating against racial minorities and to remedy the past effects of racial discrimination through affirmative action measures—endorses every out-of-turn minority referral made by Local 11. The decree placed upon Local 11 and other parties an affirmative duty to employ minorities. Thus, a reasonable inference may be drawn that each out-of-turn referral of a minority was in furtherance of that duty. That inference is persuasive unless the Board can show that

---

passed him were justifiable minority referrals, as we shall explain in part III of this opinion.

8. Local 11 was a party in *Conforti & Eiselle, Inc. v. J. Rullo & Sons, Inc.*, No. 1710–71, Order and Judgment (D.N.J. Sept. 13, 1973), *reprinted in* Brief for Respondent, Supp. at 1–5. In that case, Local 11 agreed to certain affirmative action goals with respect to minority referrals in the Newark, New Jersey area. This agreement was "embodied in an appropriate Supplementary Order in Civil Action 444–71," *id.* at 4, which is the consent decree at issue in this appeal.

9. We note further that, pursuant to the terms and conditions of the consent decree in the present case, the daily referral and requisition registers were not the only means of notating compliance with the affirmative action requirements. An entire section of the consent decree is devoted to records and reports. It mandates

that each local union submit semiannual reports to the district court, and notes specifically that

> [w]ith regard to black and Spanish–American applicants for work referral: a report denoting the names, addresses, telephone numbers, dates of registration, membership status (apprentice number, journeyman number or non-member), dates, rates of pay, and phase(s) of ironwork to be performed for each referral, contractors to whom referred and hours worked for each contractor [must be made].

Consent Decree ¶ 41(c), *reprinted in* Jt.App. at 156. The Board has made no allegation that Local 11 failed to document the out-of-turn referrals of minorities in its Title VII compliance reports. Such a finding, coupled with the absence of proper notation in the daily registers, would present a stronger case that the affirmative action justification is only pretext.

the purported affirmative action justification is merely pretext.

■ Moreover, the fact that minority union members by-passed white union members is compelling evidence that the purpose behind the out-of-turn referrals of minorities was to comply with the affirmative action mandate. The Board regarded this evidence as irrelevant, arguing that under the decision in *Int'l Union of Operating Engineers, Local 406 v. NLRB*, 262 NLRB 50, 59 (1982), *enforced* 701 F.2d 504 (5th Cir.1983), discrimination against other persons, who are not subject to the litigation, cannot bear upon the finding of discrimination against the charging party. We find this argument misplaced. In the instant matter, Local 11 has not discriminated against other union members in referring minorities out-of-turn. The union has merely complied with the dictates of the Title VII consent decree. Thus, instead of being irrelevant, minority by-passes of other union members actually corroborates our conclusion that Local 11 referred its minority members out-of-turn not to discriminate against non-members of the union, but to meet its affirmative action goals.

The remainder of the Board's arguments we find to be equally unpersuasive. Unlike in the Board's cited case, *NLRB v. American Postal Worker's Union*, 618 F.2d 1249 (8th Cir.1980), where a union's irrational actions produced the "kind of fear and uncertainty that encourage[d] people to be servile" to its authority, *id.* at 1257 n. 14, there was nothing arbitrary about Local 11's referral of minorities over both union members and nonmembers that was likely to encourage union membership. The minority referrals were rationally related to legitimate affirmative action pursuits. Moreover, since the named nonmembers would have fared no better than other union members who were by-passed in order that Local 11 could fulfill its obligations under the consent decree, it cannot be said that the union's actions encouraged membership. Indeed, if we were to hold that Local 11 discriminated against the named nonmembers on account of the out-of-turn

minority referrals, we would be granting those nonmembers *preferred* treatment over union members, which was certainly not the purpose behind § 8(b)(1)(a) and (b)(2) of the Act.

■ Finally, we reject the Board's assertion that regardless of Local 11's duty to make minority referrals in the Newark area, it had to record the reason for these referrals in the daily registers in order to rely on the affirmative action exception in the consent decree. For reasons that we have already discussed, we find this contention to be without merit. The essence of the consent decree was both the eradication of racial discrimination in local ironworkers unions in northern New Jersey and the implementation of affirmative action measures. Therefore, minority out-of-turn referrals can reasonably be inferred to have been in furtherance of the Title VII consent decree. The Board has presented no evidence to show that Local's justification for the out-of-turn minority referrals is mere pretext. For that reason, we are unpersuaded that Local 11's motivation behind the out-of-turn referrals of minorities was to discriminate against the named nonmembers. Accordingly, we will deny the Board's application for an enforcement order insofar as it pertains to alleged violations of the Act resulting from Local 11's out-of-turn referral of minority union members.

### B.

■ Local 11 maintains that, once the minority referrals are removed from the Board's finding of a violation of the Act, the remaining instances of "unexplained" out-of-turn referrals are statistically insignificant. It contends that our decision in *Ironworkers I* mandates that we deny the enforcement order *in toto* since the remaining "figures here do not reveal a disparity so widespread and overwhelming that would relieve the Board of its obligation to proffer particularized proofs of intentional discrimination." Brief for Respondent at 30. Local 11 further argues that these remaining 17 to 25 "unexplained" out-of-

turn referrals,[10] "[a]t the worst, ... constitute inadvertent errors when judged in the context of the large number of registrants (5,600) and the complexity of the referral system." Reply Brief for Respondent at 7.

Local 11 appears to have missed the thrust of our opinion in *Ironworkers I.* In that case, we held that since the Board had not allowed the respondent locals to provide *any* justification for the out-of-turn referrals, the Board had not proven its case. We further held that the Board's reliance on earlier *Ironworkers* cases was inappropriate, since in those cases "[t]he numerical and statistical evidence was overwhelming and supported a finding that the discrimination was so widespread and systematic as to make particularized proof of each instance of discriminatory referral impracticable and unnecessary." 672 F.2d at 1166. We also noted that while in the earlier cases there was "complete absence or implausibility of the recorded explanation" for out-of-turn referrals, in *Ironworkers I* the respondents offered documentary and testimonial evidence to counter the Board's findings. *Id.* Thus, we remanded the case back to the Board with instruction that "the respondent locals are entitled to, and the enforcement of the Board's order depends upon, findings of sufficient specificity so that it is clear when a violation occurred and, as to that violation, which evidence was credited and which discredited." *Id.* at 1167. On the record now before us, we find that the Board has followed our directive.

Concededly, negligence alone is insufficient for finding a violation of § 8(b)(1)(A) and (b)(2) of the Act. *See Journeymen Pipe Fitters Local 392 v. NLRB,* 712 F.2d 225, 229 (6th Cir.1983). However, as we discussed earlier, the absence of discriminatory intent does not end the analysis since "conduct [that] inherently encourages or discourages union membership is but an application of the common-law rule that a [person] is held to intend the foreseeable consequences of his [or her] conduct." *Radio Officers,* 347 U.S. at 45, 74 S.Ct. at 338. We have already found that the Board has identified facts from which it could reasonably determine that Local 11's practices resulted in violations of the Act.

Under the second prong of *Ironworkers I,* we must now determine whether any legitimate explanation for the union's action exists. In this regard, we find that Local 11 provides no explanation for the remaining out-of-turn referrals. The Board noted that the ALJ "found nothing in the testimony of Robert Wallace, Respondent Local 11's business agent, to explain any specific out-of-turn referrals...." *Ironworkers, Locals 483 and 11,* 285 N.L.R.B. No. 20, at 4 n. 5 (July 31, 1987), *reprinted in* Jt.App. at 106. Moreover, unlike with out-of-turn minority referrals, no reasonable inference can be drawn to justify these remaining referrals.

Having met *Ironworkers I*'s condition that there be a factual basis from which a reasonable determination of the Union's discrimination against non-members can be drawn, coupled with no legitimate justification for the Union's actions, the Board's findings with respect to the remaining out-of-turn referrals are supported by substantial evidence on the record as a whole. Accordingly, we will grant the Board's application for an enforcement order as it pertains to the remaining unexplained out-of-turn referrals.

IV.

For the foregoing reasons, we will deny the enforcement order as it pertains to the out-of-order referrals of minorities, but will grant the enforcement order with respect to the remaining out-of-order referrals.

---

10. Local 11 disagrees with the Board as to the number of out-of-turn referrals that occurred *prior* to February 10, 1976, the cut-off date for statute of limitations purposes under section 10(b) of the Act, 29 U.S.C. § 160(b) (1982), and *after* April 19, 1977, the last date covered in the parties' charge of discrimination. Local 11 also differs with the Board as to the number of out-of-turn referrals that were actually contractors' specific requests, and it asserts that the Board has counted some workers twice in its calculation of the number of out-of-turn referrals. We need not address these issues because Local 11 will have the chance at the remedy phase to clarify any discrepancies.