713 F.Supp. 999 (1989)
Ernest SARGENT, Plaintiff,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, FOOD AND BEVERAGE DRIVERS, WAREHOUSEMEN; Helpers Local Union No. 337; Al Schrier, Coca-Cola Supervisor, Detroit Coca-Cola Bottling Company, and the Corporate Company, Resident Agent, Jointly and Severally, Defendants.
No. 87-CV-72117-DT.
United States District Court, E.D. Michigan, S.D.
May 26, 1989.
*1000 Ann Claire Van Ash, Detroit, Mich., for plaintiff.
Jerome S. Coleman, Farmington Hills, Mich., Linda Hylenski, Detroit, Mich., and Daniel S. Bowling, Atlanta, Ga., for defendants.

OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
HACKETT, District Judge.
Now before the court are defendants' motions for summary judgment pursuant to Fed.R.Civ.P. 56.
This suit was originally filed in the Wayne County Circuit Court and arose out of plaintiff's termination from defendant Detroit Coca-Cola Bottling Company (Coca-Cola). Plaintiff's seven-count complaint included claims of violation of the Elliott Larsen Civil Rights Act, breach of contract, intentional infliction of emotional distress, breach of duty of fair representation and negligent hiring.
Defendants timely removed this matter and invoked this court's jurisdiction pursuant to 28 U.S.C. § 1441(b). Plaintiff later stipulated to the dismissal of all counts of his complaint but those that alleged a breach of contract, breach of duty of fair *1001 representation and a violation of the Elliott-Larsen Civil Rights Act, and amended his complaint to include a claim of tortious interference with contractual relations.

BACKGROUND
Plaintiff began working for defendant Coca-Cola in 1978 as a mailroom clerk. Shortly afterwards, plaintiff was promoted to the auditing department and later, at his request, became a general laborer.
During the summer of 1978, plaintiff was transferred to defendant Coca-Cola's Madison Heights warehouse. There plaintiff continued to work as a general laborer until February, 1979, when he became a hi-lo driver after grieving for the position.[1]
Plaintiff was assigned to the afternoon shift, but on occasion he would work midnights. At various times, and dependent upon which shift plaintiff was assigned, plaintiff was supervised by Dave Paula (Paula), Richard Edwards (Edwards), Hank Moritz (Moritz), Ed Bartolotti (Bartolotti), Dave Grech (Grech) and defendant Al Schrier (Schrier). Bartolotti and Schrier are white.
Plaintiff, being a member of defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Food and Beverage Drivers, Warehousemen: Helpers Local Union No. 337 (Union) since his hire in 1978, became a union steward in 1980. While a steward, plaintiff became involved with a dissident Teamster group for a brief period. Defendant Union was not aware of his association with the group.
Richard Gremaud (Gremaud) and Robert Spencer (Spencer) are both business agent/representatives for defendant Union and were assigned to represent employees at defendant Coca-Cola Madison Heights Warehouse. Gremaud twice appointed plaintiff to a negotiating committee with respect to the collective bargaining agreements. Gremaud did so because he had heard that plaintiff was a good steward and employee, and very knowledgeable of the working conditions in the warehouse. Spencer was on the same negotiating committee as plaintiff in 1981 or 1982.
Plaintiff received his first reprimand on January 15, 1979, for participating in an unauthorized work stoppage. The work stoppage was prompted by the condition of the warehouse and, up to this point, plaintiff had had no employment problems, at least that he could recall.
Plaintiff's next reprimands were issued by Bartolotti. The first of these occurred in May, 1980, and resulted in a three-day suspension when plaintiff came to the defense of an employee who had been arrested and jailed. Plaintiff explained:
A That particular night, I had received a call from an employee who was on my shift wife and she was concerned about her husband losing his job and that he was in jail. So I informed her who to talk to after she explained to me the circumstances. And she called back on the code line and I don't remember what supervisor she talked to but somehow or another it got back that he was in jail for molesting a child, which was not true. And the guy who was spreading the rumor, before I had left, I went back out on to the floor and I had asked him to, you know, don't be spreading that type of rumor around like that. And the supervisor came out and he started, you know screaming at me (Plaintiff's dep., pp. 59-60).
The next incident occurred in October, 1980, and resulted in a five day suspension. Plaintiff explained:
A Well, on this particular one, there was going to be a layoff and when you tell someone that they're going to get laid off and don't know who's going to get laid off, it was a big uproar. Everybody wanted to knowThey thought I knew. I knew nothing about layoff. Ed came out and told that there was going to be a big layoff.

*1002 Q Ed?
A Supervisor. So everybody kept coming to me asking me, "Am I going to get laid off? Am I going to be laid off?"
So after while, there was a group of people around me, you know. So Ed came up and broke up the group. And I wanted to take a pallet of glass down a hole. Fran was also moving glass.
Q Francis Kimbrough?
A Francis Kimbrough. We were both hi-lo drivers. And he went in the hole first. I was sitting out waiting for him to come out. And I was by the bottle sorting line. So one of the guys on the bottle sorting line, he walked over to the hi-lo and say. "Am I going to get laid off," and by that time, Ed was watching. He came over and he just started screaming and yelling and blah blah this, and carried on. And so I requested to see the plant manager. He told me no, I couldn't see the plant manager.
Q The plant manager is who?
A Was Ken Bouman at the time.
Q Okay.
A Right. So he just continued yelling, I mean embarrassed me. Everybody stopped and looked. Pointing his finger in my face and everything else. So I just got off the hi-lo and walked up to the front to see the plant manager, and at that time he called me a fucking nigger.
* * * * * *
A After I got off the hi-lo and started walking up front, he just said, "That fucking nigger," `cause he didn't believe I'd walk off the floor on him (Plaintiff's dep., pp. 74-76).
In this instance, Bartolotti charged plaintiff with interfering with and refusing to follow the orders or instructions of a supervisor.
Plaintiff grieved both reprimands. In August, 1981, just prior to arbitration of both grievances, defendant Coca-Cola offered to settle the grievances with plaintiff. Sheila Finney (Finney), defendant Coca-Cola's labor relations and compensation manager,[2] did so because neither Bartolotti nor plaintiff acted properly.[3]
Also during August, 1981, plaintiff was reprimanded by Paula, his afternoon shift supervisor, for excessive tardiness. Plaintiff did not contest or grieve this disciplinary action.
After the settlement of plaintiff's grievances, plaintiff continued to work afternoons and Bartolotti was transferred to midnights. Plaintiff only had to deal with Moritz, with whom plaintiff had "[n]o problems."
Sometime later, plaintiff was assigned to the midnight shift where he was supervised by defendant Schrier. On November 26, 1985, plaintiff's first suspension under defendant Schrier occurred. Defendant Schrier charged plaintiff with insubordination and poor work performance and *1003 suspended him for seven hours. Plaintiff explained:
A Okay: What happened this particular nightI'm trying to seeI had been having problems with Al. I was given the less desirable jobs, far as a hi-lo driver, and this particular night, he came up to me and he instructed me to move some pallets from the other side of the line.
* * * * * *
A And I went around and I moved the pallets. And then I came back around and went on the dock. And I had a pallet of clear glass on the forks, and Hank, who's the afternoon shift supervisorthe afternoon makes the holes for the midnight shift to put away the glass in itwhen they come in, and Hank was instructing me of where to put the glass, Al came back there screaming at me and telling me that I wasn't keeping up with the line, and he had told me to move those pallets, and he wanted me to move those mother-fucking pallets, was his exact words right now.
So I told Al I had already moved the pallets. So I put the glass away. Then I got a pallet of green glass and came back. And I guess he went to Hank.
I said, "Hank, where does the green glass go?" And this time Al came back screaming again, but this time moreso at Hank than me. And I drove back up to the line.
Then after Al had the discussion with Hank, he walked up to me and he told me that he didn't want to catch me talking with nobody; I was to stay on this line. And then he looked over there and there were some more pallets over there. I had already moved one stack of pallets. The guy had made another stock of pallets. `Cause he was throwing cases on to the line and they stake up the pallets. This was a different stack completely. And he said they could suspend me for insubordination `cause he had told me three times to move the pallets, and I told him I had already moved the pallets. Then he said I was bordering on insubordination and he could suspend me. And I told him to go ahead, suspend me. So I was suspended for seven hours that day (Plaintiff's dep., pp. 157-159).
Defendant Schrier's version of the incident differed from plaintiff's:
A All right. The line was backed up, and I was looking for Ernie and I couldn't find him. He was on the back dock somewhere. I finally found him and I told himI said, Ernie, you have got to keep that line cleared, there is nine people standing there doing nothing, you know, you have got to keep that line clear. He didn't say anything. Okay. So I walk around a little bit, I come back. The line is stopped again, and there is pallets on theon the conveyer, the line is stopped. Then Ernie is standing there talking to one of the other supervisors and I went up to him, I said, Ernie I told you to keep that line clear, I said. I know for a fact that he and the superviser were only socializing (Schrier's dep., p. 15).
* * * * * *
A Yes, all right. I told him and he said something to me and I says, Ernie, I says, you know, I keep telling you, you have got to keep this line open. You are not doing your job. You are not doing your job, you have got to keep that line clear. He said something to me, and I said to him, you know, you are bordering on insubordination, I could suspend you. He says, go for it. I said, no, then you going for the door. He told me you go for it and he, drove his hi-lo on up and he left the building (Schrier's dep., pp. 17-18).
The next suspension by defendant Schrier occurred two days later on November 28, 1985. Near the end of plaintiff's shift, defendant Schrier presented plaintiff and Larry Collie (Collie), the union steward, with a "document slip" of plaintiff's seven hour suspension. Plaintiff's and defendant Schrier's version of the incident again differed:

*1004 A AlOkay, he called me in the office, and we were sitting there and he told me why I was gettingwhy I was getting seven hours off. I had already received the seven hours off, okay?
And he went`cause they glued together
* * * * * *
A Okay? Then he went to tear it apart.
Q To tear what apart?
A See, theyit's like three or four copies. I get a copy, the steward got a copy, the company keeps a copy, and a copy to him.
It ripped. It didn't tear in half but it ripped. Then he realized that I didn't sign it so he handed it to me to see if I wanted to sign it. Okay?
Now, I got off at 7:30. They let me work all night, and they call me in about two minutes before quitting time. Everybody was punching out, going home and I threw it back on his desk and told him I didn't want to sign and I walked out.
* * * * * *
Q It was the ripped document?
* * * * * *
Q Is it your testimony here today that you did not tear the document up?
A That's right.
Q But it is your testimony that you threw the torn document on the desk and refused to sign it?
A Yes (Plaintiff's dep., pp. 176-179).
Defendant Schrier claimed:
A THE WITNESS: Let me tell you what happened when I took him into the office, then you will understand. I got ahold of Ernie and said, we are going into the office, I have a document for you. This is procedure for the union steward to sign it and for the employee to sign it. I set him down and I let the union stewardI did hand the document to the union steward, it was informing him that he had been suspended for seven hours, that was his penalty for the insubordination for the other incidents.
Q The previous day?
A The previous incident. The union steward read it, he signed it and handed it to Ernie. Ernie looked at it and he read it and he stood up and he said to mehe said, Al, you have "F'd" with a lot of people, now you are "F'ing" with the best, and he tore it right in half and threw it on the desk as he was going out the door. As he was going out the door, I said, you are now suspended again; that was was the incident (Schrier's dep., pp. 23-24).
Plaintiff was charged with gross misconduct and given a five-day suspension. Collie witnessed the incident and corroborated defendant Schrier's version. Although plaintiff grieved both charges and penalties, defendant Coca-Cola upheld them and defendant Union refused to arbitrate on behalf of plaintiff.
The next incident occurred on August 25, 1986, and resulted in plaintiff's termination on August 27, 1986. That day, plaintiff was working the afternoon shift. His immediate supervisor was Bartolotti. Defendant Schrier was supervising the midnight shift.
Defendant Schrier was on the back dock of the warehouse and noticed some trailers which required unloading. Defendant Schrier then noticed plaintiff sitting on his hi-lo reading a newspaper. Defendant Schrier and his assistant, Grech, approached plaintiff. Defendant Schrier told plaintiff to put the newspaper down and plaintiff:
A ... pulled a few feet over, he set the newspaper in theon the hi-lo and he moved a few feet over and he stopped and he took the paper up and started reading it again. I went over to him, and said, Didn't I tell you to get rid of the newspaper? I want you to get the newspaper off the hi-lo. And he said something to me like, I am not reading it here, I have got it here. I says, you are sitting here, and you are reading the newspaper and I told you to put it down and go to work. And he said something else to me. I says, if you are not going to put the paper down *1005 and go to work, I am going to suspend you. I forget what his answer was. I would have to think, but he says something back to me. I says, okayI says, you are suspended, get the hell out of here. And he came back to me and said, "F" you, and I said, what? He said, "F" you. I said, get out, get out of here, that's when Dave Grech was standing there and he heard it, and he just left his hi-lo and walked out.
* * * * * *
Q Did he give you any explanation about the newspaper?
A No, none whatsoever.
Q Did he tell you that he was using it as a clipboard?
A Why would he have to have a clipboard?
Q Was not one of Mr. Sargent's duties to keep track of how many pallets he loaded and unloaded?
A No way. I never required a hi-lo driver to keep track of that. I didn't want them to keep track of them. Nobody wanted a hi-lo driver to keep track of them; that was absolutely not one of his duties to keep track of the pallets. A clipboard,he would have no use for a clipboard, there's not a single hi-lo driver there that has a clipboard, not one of them (Schrier's dep., pp. 27-29).
Plaintiff explained the incident as follows:
A The incident was I had come into work at four o'clock. Nobody told me that I was to start at two o'clock that particular day, `cause they was running a line on the shift. Now, midnight starts at 11 o'clock. The afternoon shift would lap over the midnight shift on the line if the line started at four o'clock `cause we didn't get off `til 12:30. So on this particular day, the line had left, the people that started early had left.
I was the hi-lo driver on the line, and as the hi-lo driver, you have to keep count of how many pallets of glass you've tooken away from line. I don't know what happened to the clipboard but I found a newspaper and I folded the newspaper in half and I paper-clipped a sheet of paper to the newspaper, where I just made sticks as the count. At the end of the line shift, I was looking for the shift supervisor who was Ed Bottalotti, and he was training the new supervisor, Karen Shook, and so I drove around the building on the hi-lo and I didn't see him see them, I should say, so I drove to the shipping office.
I got off the hi-lo, I went into the shipping office. Wasn't no one in there and so I put the glass count on the desk. I came back out to the hi-lo with the newspaper in my hand. And my hi-lo was like parked in the middle of the back dock where the supervisor table is able to see me. So I walked back to the hi-lo. Al Schrier saw me. So he got Dave who was standing by the line and they both walked back there toward me. So Dave asked me what was I doing. And I said wellI explained to Dave about what happened with the line and, you know, I was looking for Ed and I don't know what I was doing next.
Q Dave Greck?
A Dave Greck, right. Okay?
So I climbed up on the hi-lo. And he said, "Well, help Collie unload the trailer." And I said, "Well, which one?" He said, "Tu one on the end."
So I droveI just took the hi-lo so I drove over to the back of the trailer to see what was on it. And so Al said, "And put the newspaper away." So I tossed the newspaper to the Coca-Cola shell. He said, "Take the newspaper off the hi-lo" (Plaintiff's dep., pp. 209-211).
* * * * * *
A Okay: So I drove over to the dock and Al told me to take the paper off the hi-lo. I said, "Al, you know there's no clipboard, I'm going to need the paper tomorrow." He said, "I want you to take it off right now." I said, "Al, I'm going to need the paper tomorrow, *1006 it's no clipboard." He said, "Well you're suspended for insubordination." Greck said, "Al, you're carrying this a little bit too far." He said, "No, I'm suspending him."
He turned back to me. He said, "Ernie, get the hell out of here." I put the hi-lo in neutral, got off and walked out of the building (Plaintiff's dep., p. 220).
A disciplinary hearing was held two days later at the Madison Heights Distribution Center. Plaintiff, Finney, Ken Bouman, another defendant Coca-Cola representative, Gremaud, Grech and defendant Schrier were present.
Just prior to the hearing, plaintiff spoke to Gremaud about the incident and explained what had happened. Gremaud listened and responded "... [o]kay, let's see what the company's got to say."
Finney began the hearing by reading Grech and defendant Schrier's statements. Plaintiff then explained what had happened and there was some discussion among them concerning the incident. Gremaud questioned Grech and defendant Schrier, as did Finney. At the conclusion of the hearing, Gremaud sought to have plaintiff reinstated with full back pay. Based upon the severity of the supervisor's report, Finney denied plaintiff reinstatement and discharged him.[4] Plaintiff was surprised by this because the supervisor's report "... was just totally untrue."
At Gremaud's suggestion, plaintiff filed a grievance. Gremaud investigated plaintiff's grievance and, while he contacted Collie in the course of his investigation, Gremaud did not further question Grech or defendant Schrier.
On October 14, 1986, plaintiff's grievance was considered by the panel at defendant Union hall.[5] Plaintiff, Finney, defendant Union attorney Ashley Lipson (Lipson) and two defendant Union business agents were among those present. Neither Gremaud, Grech nor defendant Schrier appeared at the panel hearing. Gremaud did, however, submit a written investigatory report to the panel. Finney and plaintiff testified at the panel hearing and Lipson questioned Finney with respect to plaintiff's discharge.
After the panel hearing, Larry Brennan, another defendant Union business agent, further investigated plaintiff's grievance and contacted Finney to obtain some additional information to submit to the executive board.
The panel's report was submitted to the executive board and the executive board decided not to arbitrate plaintiff's grievance. Plaintiff did not appeal from the executive board's decision and never inquired as to why it refused to arbitrate his grievance.
Plaintiff eventually began receiving unemployment benefits by virtue of defendant Coca-Cola's default.
In December, 1986, plaintiff obtained a job at Steel Container Distributing, Inc. (Steel Container) and was terminated on October 5, 1987, for falsifying his employment application. In applying for employment with Steel Container, plaintiff omitted his employment at defendant Coca-Cola. Steel Container became aware of plaintiff's previous employment with defendant Coca-Cola when defendant Coca-Cola contacted Steel Container and later served it with a subpoena to obtain plaintiff's employment records for purposes of this suit. Shortly *1007 afterwards, plaintiff was discharged.[6] Since his discharge from Steel Container, plaintiff has been unemployed.

DISCUSSION

STANDARD OF REVIEW
Federal Rules of Civil Procedure 56 provides, in part:
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
The evidence must be viewed in the light most favorable to the party opposing summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).
"[S]ummary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which a jury could reasonably find for the opposing party. Anderson, Id. at 248-250, 106 S.Ct. at 2510-2511.
If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 323, 106 S.Ct. at 2553.
Defendants contend that summary judgment is appropriate because plaintiff's claims are founded solely on conclusory allegations and are devoid of any support in the record. Defendants conclude that because there are no genuine issues of material fact, they are entitled to judgment as a matter of law.[7] Plaintiff opposes defendants' motion for summary judgment and contends that there is more than a scintilla of evidence to support a favorable verdict for him with respect to all counts of his complaint. Plaintiff points out that as the non-moving party, all doubts must be viewed in the light most favorable to him.

COUNTS I AND II

BREACH OF CONTRACT/BREACH OF DUTY OF FAIR REPRESENTATION
In order for plaintiff "[t]o prevail against either the company or the Union, ... [plaintiff] *1008 must not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union." Hines 424 U.S. at 570-571, 96 S.Ct. at 1059; United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 66-67, 101 S.Ct. 1559, 1565-1566, 67 L.Ed.2d 732 (1981) (Stewart, J., concurring). Should plaintiff fail to do so, his § 301 hybrid suit will be dismissed. Chrysler Workers Association v. Chrysler Corp., 834 F.2d 573, 582-583 (6th Cir.1987), cert. denied, ___ U.S. ___, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988). This is so because plaintiff's hybrid § 301/fair representation claims are inextricably interdependent. Mitchell, 451 U.S. at 66-67, 101 S.Ct. at 1565-1566; Chrysler Workers Association, 834 F.2d at 582-583.
Defendants first assert that plaintiff is unable to establish that defendant Union breached its duty of fair representation, or that defendant Coca-Cola breached the collective bargaining agreement, both of which, defendants argue, are necessary to sustain his hybrid § 301/fair representation claim.
Plaintiff acknowledges that he must prove liability against both defendants Union and Coca-Cola and asserts that there is sufficient evidence from which a jury could find an issue of fact regarding defendant Union's representation and the reasons for its unfairness. Plaintiff argues that the deposition testimony of Gremaud and defendant Schrier establish factual questions for the jury, and asserts that there are genuine issues of material fact. Plaintiff concludes that he has met all the prerequisites for bringing a § 301 claim.
A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. Vaca, 386 U.S. at 190-191, 87 S.Ct. at 916-917; Farmer v. ARA Services, Inc., 660 F.2d 1096, 1103 (6th Cir.1981). "Bad faith or fraud is not a necessary element of a charge of unfair representation if the union's conduct is otherwise arbitrary or perfunctory." Farmer, Id. at 1103; Bowman v. Tennessee Valley Authority, 744 F.2d 1207, 1214 (6th Cir. 1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); Ruzicka v. General Motors Corp., 523 F.2d 306, 310 (6th Cir.1975), cert. denied, 464 U.S. 982, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983).
Illustrations of conduct which constitute arbitrary or perfunctory treatment and result in a breach of a union's duty of fair representation include ineptly handling a grievance because a union is ignorant of contract provisions having a direct bearing on the case, unexplained inaction which prejudices a member's grievance, total failure to investigate the employee's claim by pliantly accepting the company's version of the incident and a union's failure to properly investigate a grievance and interview pertinent witnesses. Farmer, 660 F.2d at 1103; Grant, 626 F.Supp. at 69; Haupt v. Michigan Bell Telephone Co., 599 F.Supp. 265, 268 (E.D.Mich.1984).
Plaintiff claims in count II of his complaint that defendant Union breached its duty of fair representation by providing him with representation that was arbitrary, perfunctory and in bad faith. First, plaintiff alleges that defendant Union conducted a sham panel hearing and failed to question defendant Schrier, the complaining supervisor.
Both defendants Union and Coca-Cola assert that this allegation is contradicted by plaintiff's deposition testimony and is without merit. They argue that it constitutes nothing more than an allegation of negligence which is insufficient to sustain plaintiff's claim.
With respect to the panel hearing, plaintiff stated:
A Sheila Finney was representing the company. There was the manager from Ferndale. I can't remember his name. There with her. DePlussy; Emanuel DePlussy was his name. Lipkin was the attorney from Teamster. I don't remember who sat atwho chaired the meeting.... And there was two trustees sitting there and two business agents was there also.
* * * * * *

*1009 Q Did you give any testimony?
A Yes.
Q You explained what happened?
A Yes.
Q Did you have a full and complete opportunity to do so?
A Yes.
Q Did anyone else give testimony?
A Sheila Finney read off the supervisor's statement of what happened.
Q Anyone else?
A Far as testimony of the incident, that was it. And then(Plaintiff's dep., pp. 239-240).
* * * * * *
Q And you were satisfied then that you'd had a full hearing and that all of the facts were before that committee?
A Yes (Plaintiff's dep., p. 309).
* * * * * *
Q Mr. Sargent, did you have any complaint about the manner in which the hearing was held?
A I had complaints as to the situation that led up to the hearing.
Q That's not my question.
A No, I had no complaints about what went on in the hearing (Plaintiff's dep., pp. 309-310).
As defendants Union and Coca-Cola contend, this portion of plaintiff's deposition testimony completely contradicts his allegation that defendant Union conducted a sham panel hearing. It is obvious that plaintiff had a full and complete opportunity to explain his version of the incident and that he was satisfied with the hearing. Even if this court were to agree with plaintiff that defendant Union should have questioned defendant Schrier, this would not necessitate a finding that defendant Union breached its duty of fair representation.
Defendant Union's failure to do so could not constitute anything more than negligence or poor judgment, particularly here, where at the time of the panel hearing Gremaud had fully investigated plaintiff's grievance and had earlier questioned defendant Schrier at the disciplinary hearing. Mere negligence, poor or mistaken judgment or ineptitude are insufficient to establish a breach of the duty of fair representation. Poole, 706 F.2d at 183; National Labor Relations Board v. American Postal Workers Union, Etc., 618 F.2d 1249, 1255 (8th Cir.1980); Grant, 626 F.Supp. at 68; Haupt, 599 F.Supp. at 268.
Next, plaintiff alleges that Gremaud failed to appear at the panel and executive board hearings which decided whether to arbitrate plaintiff's grievance.
Defendant Union asserts that Gremaud's presence at the hearings was not mandated by its internal rules and regulations and that his presence at either hearing would have had little effect because an investigation revealed that the grounds for plaintiff's termination were true. Defendant Coca-Cola asserts that because plaintiff had no right to be represented by a business agent or representative of his choice, this allegation is insufficient as a matter of law to establish his claim. Plaintiff responds by emphasizing Gremaud's failure, without good reason, to attend the panel or executive board hearings and his lack of concern for plaintiff.
As with plaintiff's earlier allegation, this allegation is insufficient to establish a breach of defendant Union's duty of fair representation. Gremaud's presence at the panel hearing was not required by defendant Union's internal rules and regulations, and an employee has no right to be represented by a business agent of his choice, provided the union's choice of representative does not deprive the employee of a fair and impartial hearing. Wells v. Southern Airways, Inc., 616 F.2d 107, 110 (5th Cir.), cert. denied, 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 78 (1980); Allen v. Allied Plant Maintenance Co. of Tennessee, 636 F.Supp. 1090, 1099 (M.D.Tenn.1986).
Two business agents of defendant Union appeared in Gremaud's place and plaintiff does not allege that defendant Union's choice of representatives deprived him of a fair and impartial hearing. Also present was defendant Union's attorney Lipson. Plaintiff was not without representation. Gremaud's absence at the panel hearing under such circumstances simply does not *1010 constitute a breach of the duty of fair representation. Wells, 616 F.2d at 110; Allen, 636 F.Supp. at 1099.
Plaintiff then alleges that defendant Union breached its duty of fair representation by failing to demand the presence of the complaining supervisors at the panel hearing for cross-examination.
Defendants Union and Coca-Cola argue that defendant Union was without authority to demand the presence of the complaining supervisors at the panel hearing and that pursuant to the collective bargaining agreement, their appearances were voluntary. Defendant Union further argues that Gremaud did in fact interview the complaining supervisors, and defendant Coca-Cola asserts that a union's failure to examine witnesses or introduce evidence at a panel hearing does not amount to a breach of the union's duty of fair representation.
Plaintiff cites no authority for his proposition that defendant Union was required to demand the presence of the complaining supervisors at the panel hearing. Grech and defendant Schrier were questioned by Gremaud at the disciplinary hearing and defendant Union's failure to request their presence at the panel hearing or cross-examine them may, if error at all, be seen as tactical errors. Castelli v. Douglas Aircraft Co., 752 F.2d 1480, 1483 (9th Cir. 1985). "But if errors, they were at most errors of judgment, and not evidence of breach of the duty of fair representation." Castelli, Id. at 1483. It is not expected that the grievance process will be error-free. Hines, 424 U.S. at 571, 96 S.Ct. at 1059; Grant, 626 F.Supp. at 70.
Plaintiff also alleges that defendant Union arbitrarily and capriciously refused to take plaintiff's case to arbitration despite its obvious merit.
In response to this allegation, defendants Union and Coca-Cola assert that the failure to arbitrate a grievance is not necessarily a breach of defendant Union's duty of fair representation, and assert that plaintiff possessed no absolute right to have his grievance arbitrated. Defendants Union and Coca-Cola argue that plaintiff's grievance was without merit given plaintiff's history of insubordination.
While a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, an employee has no absolute right to have his grievance taken to arbitration. International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979); Vaca, 386 U.S. at 191, 87 S.Ct. at 917. "A wide range of reasonableness must be allowed a statutory bargaining representative in serving the union it represents, subject always to complete good faith and honesty of purpose in the exercise of discretion." Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). Unions are given considerable discretion in sifting out grievances and although what constitutes arbitrary treatment depends upon the facts of each particular case, it suffices if a union decides in good faith on the basis of objective, rational criteria that the grievance lacks sufficient merit to justify the expense of arbitration. Poole, 706 F.2d at 183; Buchanan v. National Labor Relations Board, 597 F.2d 388, 394 (4th Cir. 1979); Curth v. Faraday, Inc., 401 F.Supp. 678, 681 (E.D.Mich.1975).
By the time the executive board considered plaintiff's grievance for arbitration, defendant Union's business agents had fully investigated it. It was after a full investigation that defendant Union determined that plaintiff's grievance was not sufficiently meritorious to warrant arbitration. The grounds for plaintiff's termination included insubordination and the use of foul and abusive language towards a supervisor. In light of plaintiff's conduct and his past disciplinary record, defendant Union determined that plaintiff's grievance was unsuitable for arbitration. Defendant Union's decision not to arbitrate plaintiff's grievance was based on objective, rational criteria and did not constitute a breach of its duty of fair representation. Grant, 626 F.Supp. at 70-71. Plaintiff has failed to demonstrate that defendant Union's decision was arbitrary or capricious.
*1011 Lastly, plaintiff alleges that defendant Union deliberately and with hostility towards him, sabotaged his grievance in retaliation for his actions on behalf of a dissident Teamster group.
Defendants Union and Coca-Cola assert that this allegation is without support in the record and is based on nothing more than plaintiff's subjective feeling that his grievance was sabotaged. They argue that there is nothing in the record which suggests that any defendant Union members were aware of plaintiff's affiliations with a dissident Teamster group and point out that defendant Union continued to appoint him to bargaining and negotiating committees. Defendant Union and Coca-Cola conclude that there is no evidence of any defendant Union hostility.
Plaintiff argues that defendant Union was well aware of his affiliations with this dissident group. Defendant Union's hostility is established, plaintiff asserts, by the testimony of defendant Union's business agents Gremaud and Spencer. Plaintiff claims that Spencer called him at home and pretended to be a dissident group member and that Gremaud was informed by another defendant Coca-Cola employee that plaintiff was distributing dissident union literature at the Madison Heights warehouse. Plaintiff concludes that this testimony creates factual questions for the jury.
The dissident faction to which plaintiff refers is "Teamsters for a Democratic Union" (TDU). Plaintiff was not a member of TDU, but "actively campaigned" for it during the 1981 election. Plaintiff's only campaign activity, however, included bringing TDU propaganda into the Madison Heights warehouse and placing it in the lunchroom for other employees. This activity occurred from March, 1981, until the election in October, 1981, and some three or four months afterwards. Plaintiff also on some occasions discussed TDU with other employees. Plaintiff engaged in no other TDU-activity in 1981 and did not openly support any TDU candidates.
Plaintiff kept his association with TDU quiet.
Q All right. So you kept your TDU association, whatever that was, quiet?
A Yes, because I wasn't reallyI was just getting into TDU then and I really didn't know where they were coming from but some of the things that they werehad on their proposals, I agreed with (Plaintiff's dep., p. 280).
Between the 1980 election and the following election, plaintiff engaged in no other TDU activity, but for bringing in TDU propaganda. Plaintiff again described this period as quiet and attended no TDU meetings.
Q Now, presume again for the moment, Mr. Sargent, that there was an election in 1983. Did you participate in any dissident activity, as you describe it, in respect to the '83 election?
A No.
* * * * * *
Q You engaged in no dissident activity in respect to the '83 election?
A No.
Q Did you campaign for TDU candidates during the '83 election?
A No.
Q Did you campaign for any candidates in the '83 election?
A No (Plaintiff's dep., pp. 281-282).
* * * * * *
Q Is it fair to say that after 1983, other than receiving the newspaper or seminar material, that you had no other activity that you would describe as dissident activity?
A Yes (Plaintiff's dep., pp. 283-284).
Plaintiff admitted that he never inquired as to why defendant Union decided not to arbitrate his grievance and stated that he surmised it was because of his dissident activity.
Q It's fair to say isn't it that it's really a feeling that you have because you don't know whythat the reason the union didn't take your case to arbitration is because earlier on you might have been involved in some dissident activity.
A Yes.

*1012 Q And so you really don't base that on any direct knowledge that you may have?
A You mean far as anyone from the union saying that? No.
Q Nobody told you that?
A No.
Q You never saw any documents that led you to that conclusion?
A No.
Q It's just a feeling that you have?
A Yes.
Q And you have that feeling `cause you don't understand why, after what you thought was a successful hearing, you got a negative reaction.
A Yes (Plaintiff's dep., pp. 328-329).
Plaintiff's testimony establishes that he has nothing concrete upon which to base his claim. Although plaintiff asserts that defendant Union was aware of his dissident activity, Spencer denied calling plaintiff at home and pretending to be a TDU member. Gremaud was not aware of plaintiff's affiliation with TDU and twice invited plaintiff to be on a negotiating team for the collective bargaining agreement. None of this suggests that defendant Union harbored any hostility towards plaintiff or sabotaged his grievance.
In count one of this complaint, plaintiff alleges that defendant "Coca-Cola discharged [him] without just cause, in violation of the Collective Bargaining Agreement's Clause VI, Sec. 21 requiring progressive discipline, for a trivial incident involving his use of a newspaper as a substitute for a clipboard." "As a finding of a breach of the duty of fair representation is essential to [p]laintiff's claim against [his] employer, [defendant Coca-Cola] is likewise entitled to summary judgment in its favor...." Grant, 626 F.Supp. at 71; Hines, 424 U.S. at 570-571, 96 S.Ct. at 1059; Mitchell, 451 U.S. at 66-67, 101 S.Ct. at 1565-1566. Because there are, as defendants argue, no genuine issues of material fact, counts I and II of plaintiff's complaint are dismissed.

COUNT IIIVIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT
Plaintiff alleges:
* * * * * *
13. Defendant Coca Cola had at its warehouse in Madison Heights, Michigan, two black employees. Both have been terminated.
14. Defendant shift supervisor, Al Schrier disciplined and suspended both black employees on numerous occasions. His suspension of Plaintiff led to his termination from employment at Coca Cola.
15. Plaintiff had received two other suspensions, during his eight and one half years of employment from the same shift supervisor, Al Schrier.
Defendants Coca-Cola and Schrier contend that this count should be dismissed for lack of subject-matter jurisdiction because plaintiff's claim of racial discrimination is pre-empted by § 301 of the Labor Management Relations Act (LMRA), 1947 § 301 et seq., 29 U.S.C. § 185 et seq. Defendants argue that plaintiff's state claim is inextricably intertwined with consideration of the terms of the collective bargaining agreement in that it involves identical facts and turns on the application and interpretation of the collective bargaining agreement. Defendants further argue that the collective bargaining agreement was the exclusive means of resolving plaintiff's complaint and conclude that for these reasons they are entitled to summary judgment. Plaintiff contends that his claim is not pre-empted by the LMRA for the reason that the collective bargaining agreement makes no reference to racial discrimination and concludes that his claim is not intertwined with the terms of the collective bargaining agreement.
The pre-emptive force of § 301 is powerful and displaces any state cause of action for violation of contracts between an employer and a labor organization. Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California, 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983). *1013 "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959).
However, inflexible application of the pre-emption doctrine is to be avoided, and not all local regulation that touches or concerns in any way the complex interrelationship among employees, employers and unions is pre-empted. Farmer, Special Administrator v. United Brotherhood of Carpenters & Joiners of America, Local 25, 430 U.S. 290, 295-296, 302, 97 S.Ct. 1056, 1060-1061, 1064, 51 L.Ed.2d 338 (1977). The state cause of action is not pre-empted if the activity regulated by the states is merely a peripheral concern of the Labor Management Relations Act, or touches interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it cannot be inferred that Congress intended to deprive the states of the power to act. Garmon, 359 U.S. at 243-244, 79 S.Ct. at 778-779; Farmer, 430 U.S. at 296-297, 97 S.Ct. 1061-1062. Pre-emption must be determined by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme. Farmer, 430 U.S. at 297, 300-301, 97 S.Ct. at 1062-1064.
The court must first determine whether the underlying conduct is protected under the LMRA to ensure that permitting the state cause of action to proceed would not result in state regulation of conduct Congress intended to protect. Farmer, 430 U.S. at 298, 97 S.Ct. at 1062. Next, the court must determine whether the state has an overriding interest in protecting residents from the conduct involved and whether this interest is deeply rooted in local feeling and responsibility. Farmer, 430 U.S. at 298, 97 S.Ct. at 1062. Lastly, the court must determine whether the state cause of action would interfere with the effective administration of national labor policy. Farmer, 430 U.S. at 298, 97 S.Ct. at 1062.
As the Supreme Court explained in Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211-213, 105 S.Ct. 1904, 1911-1912, 85 L.Ed.2d 206 (1985):
... not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law. Section 301 on its face says nothing about the substance of what private parties may agree to in a labor contract. Nor is there any suggestion that Congress, in adopting § 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation.
* * * * * *
In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.
Therefore, state-law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties, are pre-empted by those agreements ... [The] analysis must focus then, on whether the ... tort action ... confers non-negotiable statelaw rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.
Thus, "... even if dispute resolution pursuant to a collective bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the statelaw claim can be resolved without interpreting the agreement itself, the claim is `independent' of the agreement for § 301 pre-emption purposes." Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. *1014 ___, ___, 108 S.Ct. 1877, 1883, 100 L.Ed. 2d 410 (1988).
In light of these principles, the court concludes that plaintiff's claim under the Elliott-Larsen Civil Rights Act, M.C.L.A. 37.2101 et seq., is independent of the collective bargaining agreement and not pre-empted by § 301. Not only does the Elliott-Larsen Civil Rights Act endow non-negotiable state rights that are entirely independent of the collective bargaining agreement and permits plaintiff's claim to be resolved without interpretation of the agreement, but the regulated conduct here touches interests so deeply rooted in local feeling and responsibility that the court cannot infer that Congress intended to deprive the States of the power to act. See, e.g. Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc., 372 U.S. 714, 721, 83 S.Ct. 1022, 1025-1026, 10 L.Ed.2d 84 (1963); Gavie v. Stroh Brewery Co., 668 F.Supp. 608, 610-611 (E.D. Mich.1987); Trombley v. Ford Motor Co., 666 F.Supp. 972, 973-974 (E.D.Mich.1987); Sears v. Ryder Truck Rental, Inc., 596 F.Supp. 1001, 1002-1003 (E.D.Mich.1984).
Defendants Coca-Cola and Schrier next contend that plaintiff's complaint fails to set forth a prima facie case of race discrimination in that plaintiff fails to allege either disparate treatment or intentional discrimination. Alternatively, defendants contend that plaintiff's claim of race discrimination warrants dismissal because he cannot establish a prima facie case of race discrimination. Defendants argue that they have submitted uncontroverted evidence of a legitimate, non-discriminatory reason for plaintiff's discharge and that plaintiff has no evidence to demonstrate that the stated reasons were merely a pretext for discrimination. Defendants Coca-Cola and Schrier conclude that there is no evidence, either direct or circumstantial, to substantiate plaintiff's claim of race discrimination, and that this claim is based upon plaintiff's unsubstantiated and subjective belief that he was discriminated against.
Plaintiff acknowledges that it is his burden to prove a prima facie case of race discrimination and contends that there exists more than a scintilla of evidence of discrimination. Plaintiff argues that his is a case of individual disparate treatment and that he must be given a full and fair opportunity to develop, address and prove that the stated reasons for his discharge were a pretext. Plaintiff directs the court's attention to the fact that he worked for defendant Coca-Cola for eight years, maintained a good-to-excellent work record and was otherwise a sociable, agreeable, popular and hard-working employee. Plaintiff also directs the court's attention to the fact that Finney admitted that he was an excellent hi-lo driver and asserts that as a result of his termination, there existed a vacancy.
"To sustain a claim of racial discrimination in violation of § 202 of the [Elliott-Larsen] Civil Rights Act, a plaintiff must make a prima facie showing of discrimination, either by disparate treatment or intentional discrimination." Marsh v. Department of Civil Service (After Remand), 173 Mich.App. 72, 79, 433 N.W.2d 820, 823 (1988), lv. den., 423 Mich. ___ 1989; Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253, 101 S.Ct. 1089, 1093-1094, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973).
(1) Disparate treatment. To make a prima facie showing of discrimination, the one alleging disparate treatment must show that he was a member of the class entitled to protection under the act and that, for the same or similar conduct, he was treated differently than one who was a member of a different race. Pompey v. General Motors Corp., 385 Mich. 537, 542, 549; 189 NW2d 243 (1971).
(2) Intentional discrimination. Here, plaintiff must show that he was a member of the affected class, that he was discharged, and that the person discharging him was predisposed to discriminate against persons in the affected class and had actually acted on that disposition in discharging him. Civil *1015 Rights Comm v. Chrysler Corp, 80 Mich App 368, 373, fn 3; 263 NW2d 376 (1977).
Schipani v. Ford Motor Co., 102 Mich. App. 606, 617, 302 N.W.2d 307, 312 (1981); Marsh, 173 Mich.App. at 79, 433 N.W.2d at 823.
If plaintiff succeeds in proving his prima facie case, the burden shifts to defendants Coca-Cola and Schrier to articulate some legitimate, non-discriminatory reason for plaintiff's termination. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093; McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. at 1824. Defendants need not persuade the court that it was actually motivated by the proffered reason, and it is sufficient if defendants' evidence raises a genuine issue of fact as to whether it discriminated against plaintiff. Burdine, 450 U.S. at 254-255, 101 S.Ct. at 1094.
Should defendants Coca-Cola and Schrier carry this burden, plaintiff then has an opportunity to demonstrate by a preponderance of the evidence that the legitimate reasons offered by defendants were not its true reasons, but rather a pretext for discrimination. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093; McDonnell Douglas Corp., 411 U.S. at 804, 93 S.Ct. at 1825. However, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253, 101 S.Ct. at 1093.
Plaintiff claims disparate treatment to make his prima facie showing of race discrimination and while plaintiff can show that he is a member of a class entitled to protection under the act, the court is not persuaded that plaintiff can establish that for the same or similar conduct, he was treated differently than one who was a member of a different race.
To sustain his claim of discriminatory discharge, plaintiff must show that his employment terms varied from those which defendant Coca-Cola accorded to similarly situated white workers. Long v. Ford Motor Co., 496 F.2d 500, 505 (6th Cir.1974); Flaig v. Bendix Corp., 488 F.Supp. 336, 338 (E.D.Mich.1980), aff'd, 701 F.2d 177 (6th Cir.1982). This requires proof that he and the white employee were similarly situated in all relevant respects and that the other employee's acts were of comparable seriousness to his own. Lanear v. Safeway Grocery, 843 F.2d 298, 301 (8th Cir. 1988).
"Plaintiff relies on the facts that Coca-Cola Supervisor continuously and repeatedly disciplined him and eventually disciplined him to the point where Plaintiff was fired from his job."[8]
A Mr. Schrier was trying to fire me. Even after I left the shift, he kept notes on me. Even these notes you showed me today, I was not on his shift. He constantly kept notes on me. There's more notes than what you've got also, that I have seen. He kept notes on me. He watched me very carefully for the time.... Yes, Mr. Schrier was after Ernie Sargent. And I knew about it ... (Plaintiff's dep., pp. 265-266).
To substantiate his claim, plaintiff argues that although defendant Coca-Cola is attempting to refute his claim of racial discrimination by showing that Brian Sakowski (Sakowski), a white employee, was terminated for directing profanity at a supervisor, this means nothing because Sakowski was reinstated and still employed when plaintiff was discharged. However, Sakowski was not a similarly situated comparable. He, unlike plaintiff, had no history of insubordination or similar disciplinary difficulties. Sakowski's incident involved a different supervisor and occurred approximately five years prior to plaintiff's termination. The court also finds it significant that plaintiff's termination occurred not only as a result of directing an expletive at defendant Schrier, but also for insubordination and the refusal to follow defendant Schrier's instructions. It was defendant Coca-Cola's prerogative to determine whether this type of misconduct constituted grounds for termination and only necessary that it apply the same standard alike to members of all races. Reynolds v. *1016 Humko Products, 756 F.2d 469, 472 (6th Cir.1985). The fact that Sakowski was discharged suggests that defendant Coca-Cola applied the same standard alike to all members of all races. The court acknowledges that Sakowski was reinstated after filing a grievance, but once again notes that Sakowski was not plaintiff's comparable.
Plaintiff also argues that defendant Schrier and Bartolloti discriminated against him and that defendant Coca-Cola cannot prove that he engaged in any misconduct so as to warrant his termination. This, plaintiff asserts, is established by the fact that he received unemployment benefits. Plaintiff claims that defendant Schrier picked on him and continually reprimanded him because he was black and that Willie Lathan (Lathan) suffered the same or similar treatment by defendant Schrier.
As for plaintiff's allegations with respect to defendant Schrier, they demonstrate nothing more than a personality conflict between defendant Schrier and him. Plaintiff admitted this conflict:
Q From the perspective of your personality and Al Schrier's personality, would you say that there was a conflict?
A Yes (Plaintiff's dep., p. 168).
Defendant Schrier suspended plaintiff three times. In each instance, plaintiff had violated defendant Coca-Cola's work rules so as to warrant the disciplinary action.[9] Also, in each instance, defendant Schrier's version of the incident was corroberated. Defendant Schrier was not involved in the decision to terminate plaintiff, and Finney investigated plaintiff's complaint that defendant Schrier's disciplinary action was racially motivated and found it to be without any factual basis. There is no evidence in the record that defendant Schrier harbored any racial animus towards plaintiff. Plaintiff has failed to put forth even a scintilla of evidence to substantiate his claim.[10]
Even if plaintiff were able to meet his burden of showing a prima facie case of race discrimination, defendants have articulated legitimate, non-discriminatory reasons for plaintiff's termination. Plaintiff has presented nothing to rebut these reasons.
Plaintiff was discharged for insubordination and his failure to follow defendant Schrier's instructions. Defendant Schrier had given plaintiff a direct order which plaintiff twice refused to follow and, during the course of the incident, plaintiff directed an expletive at defendant Schrier. At the disciplinary hearing, plaintiff admitted that he had refused a direct order by defendant Schrier. In his deposition testimony, plaintiff also acknowledged that using an expletive against a supervisor constituted a violation of defendant Coca-Cola's work rules and cause for discharge under the collective bargaining agreement. Plaintiff further acknowledged that if defendant Schrier's version of the incident were accepted as true, as this uncontradicted record indicates, discharge was appropriate.
Plaintiff characterizes the incident as trivial, but Finney stated that defendant Coca-Cola does not tolerate the type of conduct displayed by plaintiff and that it considers such conduct very serious. Plaintiff denied reading the newspaper or swearing at defendant Schrier and insisted that he was employing the newspaper as a clipboard to keep count of the line. However, the record contradicts plaintiff's assertions. First, Grech corroborated defendant *1017 Schrier's version of the incident and both defendant Schrier and Grech stated that there was no reason for plaintiff to have required the use of a clipboard. In short, defendant Coca-Cola proffered several non-discriminatory reasons for plaintiff's termination.
Plaintiff asserts that the reasons for his termination were merely a pretext and claims that he and Lathan, the only other black employee assigned to the Madison Heights warehouse, "were being treated differently ... for being black" and required to abide by certain rules which did not exist for other employees.
The disparate treatment to which plaintiff refers includes the white employees enjoying greater phone, lavatory and lunch privileges. With respect to the lunch privileges, plaintiff explained that he and Lathan were allowed one-half hour for lunch while the white employees were given a forty-five minute lunch period. As for the phone and lavatory privileges, plaintiff stated:
"Well, in me and Willie's situation, for being black. Because like I said, look like when the white employees, when they had a phone call and had to go to the bathroom it was okay but me and Willie had certain rules we had to abide by" (Plaintiff's dep., p. 159).
Plaintiff also claims that the white employees were given more desirable jobs; that their job preferences were honored; that he and Lathan were never rotated on the job as the white employees; and, that unlike the white hi-lo drivers who were assigned to the line, plaintiff was required to not only work the line, but also move pallets, a bailout machine and "drop product down." Finally, plaintiff has alleged that Bartolotti called him a "fucking nigger" on one occasion.
While the continuous use of racial or ethnic slurs may be sufficient for finding liability for discrimination, occasional or sporadic instances of such conduct are insufficient. Torres v. County of Oakland, 758 F.2d 147, 152 (6th Cir.1985); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir.1981). The record suggests that this was an isolated incident which occurred some three years ago. This allegation is insufficient to establish liability for race discrimination. And, in view of the conclusory allegations plaintiff relies on to support his charge of "pretextual" evidence of discriminatory motivation for his discharge and the strength of defendant Coca-Cola's explanation for its decision, the court concludes that plaintiff cannot prevail on his claim of discrimination. There exist no genuine issues of material fact and count III of plaintiff's complaint is dismissed.

COUNT IVTORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
Count IV is directed only at defendant Coca-Cola and alleges:
* * * * * *
17. Plaintiff attempted to mitigate his damages by seeking other employment after his termination from Coca Cola.
18. Each time Plaintiff listed Coca Cola as a former employer he was unable to find a job.
19. Plaintiff did not list Coca Cola as a former employer when he made application to Steelcontainer Corporation. He was hired.
20. When Steelcontainer received a Subpoena from Coca Cola, Plaintiff was fired on the spot.
21. Since then Plaintiff has listed Coca Cola as a previous employee on more than forty job applications but he has been unable to obtain employment nor receive unemployment compensation.
Defendant Coca-Cola contends that plaintiff has failed to state a cognizable claim of tortious interference with contractual relations, or present sufficient facts in support of the claim. Defendant Coca-Cola argues that plaintiff is unable to establish even one required element of the claim and that he has failed to allege a contract, tortious conduct on defendant Coca-Cola's behalf or a breach with resulting damages, all of which are essential to his claim. Defendant Coca-Cola then asserts *1018 that its use of the judicial process to subpoena records also fails to establish even one of the prima facie elements of plaintiff's cause of action because it was motivated by legitimate business reasons in doing so and it was not a per se wrongful act. Alternatively, defendants dispute the existence of a valid employment contract and contend that even if there was an employment contract, there was no breach of that contract because Steel Container was entitled to terminate plaintiff's employment due to the falsification of his application.
Plaintiff acknowledges that he deliberately did not list defendant Coca-Cola as a former employer on his employment application, but asserts that he did not attempt to conceal his previous employment. Plaintiff argues that he spoke to Freud about his employment at defendant Coca-Cola several weeks before he was fired. Plaintiff further asserts that Freud's testimony at the arbitration and Michigan Employment Security Commission (MESC) hearings demonstrates that he spoke to Sally Geib (Geib), defendant Coca-Cola's counsel, and that she informed him that plaintiff had been fired for insubordination and had filed suit. The question of fact that Freud's testimony presents, plaintiff asserts, is highlighted by the fact that he has now retracted his statements and denies any conversation with Geib.
Plaintiff also argues that he believes that the testimony of Perry Edgells (Edgells), another Steel Container employee, and Freud will show that he had no intention of misleading Steel Container. Plaintiff claims that during his employment interview with Edgells, plaintiff informed him that he had worked at defendant Coca-Cola. Plaintiff further asserts that defendant Coca-Cola, by conversing with Freud about the details of plaintiff's suit prior to Steel Container receiving a subpoena for plaintiff's employment records, caused plaintiff to lose his job. Plaintiff concludes that a question of fact exists as to whether defendant Coca-Cola caused plaintiff to lose his job and argues that but for defendant Coca-Cola's calls to Freud and its discussions with him, plaintiff would still be employed at Steel Container.
A prima facie case of tortious interference with contractual relations requires a showing that (1) a contract existed; (2) the contract was breached; (3) the defendant instigated the breach; and, (4) the defendant did so without justification. Henry v. Hospital and Health Services Credit Union, 164 Mich.App. 90, 94, 416 N.W.2d 338, 340 (1987). To sustain a claim of tortious interference with contractual relations, the plaintiff must prove the intentional doing of a per se wrongful act, or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights of another. Formall, Inc. v. Community National Bank of Pontiac, 166 Mich.App. 772, 779, 421 N.W.2d 289, 292-293 (1988).
The defendant's interference must not only be intentional, but improper. Formall, Inc., Id. at 779, 421 N.W.2d at 293. Improper in this respect means illegal, unethical or fraudulent, Formall, Inc., Id. at 779, 421 N.W.2d at 293, and a per se wrongful act is an act that is inherently wrongful or one that is never justified under any circumstances. Formall, Inc., Id. at 780, 421 N.W.2d at 293.
Plaintiff's claim as plead fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Plaintiff has failed to allege the requisite elements of a claim for tortious interference with contractual relations. Even if this court were to infer the existence of contract and a breach, plaintiff has failed to allege that defendant Coca-Cola instigated the breach, or that defendant Coca-Cola did so without justification.
Alternatively, this count of plaintiff's complaint is dismissed under Fed.R. Civ.P. 56. Plaintiff misses the mark in directing the court's attention to the fact that the record supports his contention that he had no intention of misleading Steel Container, and that he informed Steel Container of his prior employment with defendant Coca-Cola. To sustain such a claim, the focus is not on the plaintiff's intent, but rather the defendant's. Defendant Coca-Cola's *1019 correspondence with Steel Container may have apprised Steel Container of plaintiff's previous employment, but on this record, the correspondence, including the subpoena, did not constitute a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights of another.
Plaintiff initiated this suit and by doing so, put at issue the documents which defendant Coca-Cola sought from Steel Container. Defendant Coca-Cola did not attempt to subpoena these records until plaintiff failed to produce them and thereby necessitated the subpoena. No liability will be imposed where, as here, the defendant's actions were not per se wrongful and instead motivated by legitimate personal and business reasons, rather than a desire to interfere with plaintiff's employment relationship with Steel Container.[11]Formall, Inc., Id. at 780, 421 N.W.2d at 293; Bonelli v. Volkswagon of America, Inc., 166 Mich. App. 483, 499, 421 N.W.2d 213, 221, lv. denied, 430 Mich. 896 (1988). Consequently, count IV of plaintiff's complaint is dismissed.

CONCLUSION
The parties having submitted lengthy briefs in support of their respective positions, as well as reply briefs, and the court having thoroughly reviewed and considered those briefs and the record, the court has determined that oral arguments would not assist the court. Local Rule 17(l)(2).
For all the reasons stated in this opinion, the court hereby dismisses plaintiff's complaint in its entirety. Having dismissed plaintiff's complaint, the court finds it unnecessary to address defendants' motion for partial summary judgment as to damages. Accordingly,
IT IS ORDERED that defendants' motions for summary judgment are granted and that plaintiff's complaint is dismissed with prejudice.
NOTES
[1] According to plaintiff's deposition testimony, he became a full-time hi-lo driver in the summer of 1979, but defendant Coca-Cola's records indicate that plaintiff began receiving pay as a hi-lo driver in February, 1979.
[2] Finney's duties included administering the collective bargaining agreements, investigating disciplinary action, advising and counseling the supervisors, processing employee discharges, representing defendant Coca-Cola through the grievance process, training supervisory personnel and reviewing wage adjustments.

Finney is black and first met plaintiff when he began working at defendant Coca-Cola in 1978. She and plaintiff became good friends.
[3] With respect to the October, 1980, incident, plaintiff alleges that he claimed both verbally and in writing that Bartolotti's disciplinary action was racially motivated. The basis of plaintiff's claim was that Bartolotti called him a "fucking nigger." Plaintiff also claims that at the settlement meeting between him and Finney, Finney stated that there would be a lot of changes at the Madison Heights warehouse, but acknowledged that Finney did not state that plaintiff's grievances prompted the changes or that there would be changes in the area of race relations.

However, the settlement agreement included no references to discriminatory treatment and while Finney acknowledged that plaintiff often complained of discriminatory treatment, her investigation of these complaints found them to be without merit.
Plaintiff insists that Finney believed that race relations were a problem at defendant Coca-Cola Madison Heights warehouse because when plaintiff was transferred there, Finney stated that she wanted to add a little color or flavor to the warehouse. Finney did not recall making such a remark to plaintiff.
[4] Finney had the authority to discharge employees and consulted with no other defendant Coca-Cola representative in arriving at her decision to discharge plaintiff. Finney explained that plaintiff was discharged as a result of his insubordination, including the use of an expletive, and failure to follow instructions. She stated that defendant Coca-Cola considered such conduct a serious matter and would not tolerate it. Finney had discharged others for similar conduct towards a supervisor and could not recall defendant Union ever arbitrating a grievance involving similar charges.

Finney also stated in her deposition testimony that she investigated plaintiff's allegations of racial discrimination with respect to defendant Schrier's disciplinary action and found no "... factual indication of any racial discrimination" (Finney's dep., pp. 93, 97).
[5] Although defendants dispute the timeliness of plaintiff's grievance, defendant Coca-Cola did in fact respond to it and the merits of the grievance were considered by the panel and executive board. Consequently, the court finds unpersuasive defendants' contention that plaintiff's grievance was untimely.
[6] According to an affidavit submitted by Jay Freud, Steel Container's vice-president, defendant Coca-Cola did not induce or encourage Steel Container to discharge plaintiff.
[7] Defendants Union and Coca-Cola also contend that plaintiff's claims are barred because he failed to exhaust his intra-union remedies. They assert that intra-union exhaustion is a prerequisite to commencing suit against a union for breach of its duty of fair representation. Plaintiff argues that defendants' assertion is without merit. Plaintiff states that he believed that when defendant Union denied him arbitration, his only recourse was to a court of law.

If an employee resorts to the courts before the grievance and arbitration procedures established by a collective bargaining agreement have been fully exhausted, an independent suit against the employer or union will be dismissed. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 563, 96 S.Ct. 1048, 1055-1056, 47 L.Ed.2d 231 (1976); Vaca v. Sipes, 386 U.S. 171, 184-185, 87 S.Ct. 903, 913-914, 17 L.Ed.2d 842 (1967); Republic Steel Corp. v. Maddox, 379 U.S. 650, 652-653, 85 S.Ct. 614, 616-617, 13 L.Ed.2d 580 (1965). In such circumstances, judicial review of the employee's claim is appropriate only where the employer's conduct amounts to a repudiation of those contractual remedies, or where a union wrongfully refuses to process the employee's grievance and by doing so breaches its duty of fair representation. Hines, 424 U.S. at 567-571, 96 S.Ct. at 1057-1059; Vaca, 386 U.S. at 185-187, 87 S.Ct. at 914-915; Anderson v. Ideal Basic Industries, 804 F.2d 950, 952 (6th Cir.1986); Poole v. Budd Co., 706 F.2d 181, 183 (6th Cir.1983).
Because plaintiff has alleged a breach by defendant Union of its duty of fair representation, plaintiff was not required to exhaust his intra-union remedies. A failure to exhaust is excused if the employee alleges that the union breached its duty of fair representation. Poole, Id. at 183. Plaintiff's claims are properly before the court. Grant v. ARA Services, Inc., 626 F.Supp. 66, 68 (S.D.Ohio 1985).
[8] Plaintiff's Answer to Defendant's Reliance on Additional Authority, p. 1.
[9] Defendant Schrier was not involved in Lathan's discharge from defendant Coca-Cola. Lathan was discharged in June, 1986, after he failed to return from a medical leave and supply defendant Coca-Cola with any documentation.
[10] The court acknowledges that the record demonstrates, as plaintiff contends, that he maintained a good-to-excellent work record and that Finney admitted that he was an excellent hi-lo driver. This does not, however, excuse the conduct which led to his discharge or erase his history of disciplinary difficulties.

As for Finney's opinion of plaintiff's skills as a hi-lo driver, she also stated that "[h]e consistently had a problem in dealing with conflict, it frequently interrupted his effectiveness ... he had some difficulty in handling conflict, particularly if it involved himself" (Finney's dep., pp. 82-83).
[11] The possibility that there exists a conflict in Freud's testimony at the arbitration and MESC hearings and his affidavit does nothing to lend support to this count of plaintiff's complaint or create a genuine issue of a material fact. Given the court's analysis, whether Geib in fact spoke to Freud is unimportant. This is so because the record contradicts plaintiff's assertion that defendant Coca-Cola instigated or induced his termination from Steel Container.